**PLAYBOY ENTERPRISES, INC., Plaintiff,**

v.

**CHUCKLEBERRY PUBLISHING, INC., Tattilo Editrice SPA, Publishers Distributing Corporation, Arcata Publications Group, Inc., Defendants.**

No. 79 Civ. 3525.

United States District Court, S. D. New York.

April 1, 1981.

Darby & Darby, P.C., William F. Dudine, Jr. and David R. Francescani, New York City, for plaintiff.

Goldschmidt, Fredericks, Kurzman & Oshatz, Barry I. Fredericks and Edward Sussman, New York City, for defendants.

## OPINION AND ORDER

SOFAER, District Judge:

In this litigation, the publisher of *Playboy* magazine seeks to bar defendants from using the name *"Playmen"* in the title or subtitle of any male sophisticate magazine. An earlier decision, *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 486 F.Supp. 414 (S.D.N.Y.1980) [hereinafter cited as *"PEI* at (page)"], preliminarily enjoined defendants from publishing such a magazine under the *Playmen* name. Beginning with their January 1980 issue, defendants have published their male sophisticate magazine under the mark *"Adelina,"* with the subtitle *"America's Edition of Italy's Playmen."* The trial of this action commenced on October 24, 1980. Thereafter, plaintiff moved for a permanent injunction against the use of "Playmen" in the title or subtitle of defendants' magazine. In addition, plaintiff requested that the injunction extend to various foreign nations, and it sought punitive damages, attorney fees, and costs. Defendants opposed these requests. This opinion constitutes the Court's findings of fact and conclusions of law.

The details of the dispute between these parties is set forth in the Court's decision on

the motion for preliminary relief, *PEI* at 418–19, and this opinion assumes familiarity with the earlier decision. In capsule, the relevant background is that, in July 1979, defendants announced that they intended to publish a male sophisticate magazine entitled *"Playmen"* in the United States.[1]

Upon learning of defendants' plans, plaintiff (the publisher of *Playboy*) promptly filed its complaint, accusing defendants of trademark infringement and unfair competition. Lanham Trademark Act §§ 32(1), 43(a), 15 U.S.C. §§ 1114(1), 1125(a); N.Y. General Business Law § 368–d (McKinney 1968). After hearings and extensive briefing, the Court informed the parties on September 11, 1979 that it was inclined to issue a preliminary injunction. The opinion, issued on February 6, 1980, found that plaintiff was likely to prevail, that plaintiff would be irreparably harmed by denial of injunctive relief, and that the balance of hardships tipped decidedly in plaintiff's favor. On February 20, 1980, the Court entered an order preliminarily enjoining defendants from "[u]sing the word *Playmen,* or any other mark, word or name which is confusingly similar to *Playboy,* as the title of a male entertainment magazine or in advertising, promotion, distribution or sale of a male entertainment magazine or related book, calendar or product."

After the Court had indicated its inclination to grant preliminary relief, defendants decided to change the name of *Playmen* magazine to *"Adelina,"* with the subtitle *"America's Edition of Italy's Playmen."* Commencing with the January 1980 issue, *Adelina* has (with some exceptions) been published on a monthly basis. *See* Plaintiff's Ex. 66A–66I.

Four questions are before the Court: should the preliminary relief be made permanent; should defendants be enjoined from using the term "Playmen" in the subtitle of a male sophisticate magazine;

1. Defendant Chuckleberry Publishing, Inc. ["Chuckleberry"] possesses worldwide publication rights for the English-language version of *Playmen.* Chuckleberry retained defendants Publishers Distributing Corporation and Arcata Publications Group to print and distribute the magazine; Publishers Distributing Corporation is no longer a defendant. Defendant Tattilo Editrice SPA is an Italian company that publishes an Italian-language magazine named *Playmen.*

should the injunction apply to defendants' extraterritorial activities; and should plaintiff be awarded punitive damages, attorney fees, and costs?

## I.  Use of "Playmen" in a Title

■ The prior opinion held that plaintiff was likely to succeed on its claim that entitling defendants' magazine *Playmen* infringed upon plaintiff's *Playboy* trademark. *PEI* at 419–29. After determining that plaintiff's trademark was valid, the Court examined five factors in reaching that conclusion on the infringement issue: the strength of the *Playboy* mark; the similarity of the *Playboy* and *Playmen* marks; the similarity of the respective products; defendants' purpose in adopting the *Playmen* mark; and the proof of likely confusion from defendants' use of the *Playmen* mark. The evidence, both testimonial and documentary, submitted by the parties on the motion for permanent injunction confirms—and in several respects strengthens—the Court's preliminary findings.[2]

### A.  Strength of the Playboy *Mark*

The earlier opinion characterized the term *"Playboy"* as a suggestive, rather than a generic or descriptive, trademark. The mark had acquired great distinctiveness among consumers, moreover, and was entitled to a high degree of protection. Its value was estimated as in excess of $200 million, and the Court found that *Playboy* magazine was the crucial component of plaintiff's business empire. *PEI* at 419–21. Defendants have not contested these findings. On the contrary, one of their expert witnesses, John Hayes, acknowledged that the *Playboy* mark was "[v]ery strong." Transcript at 312.

### B.  Similarity of the Marks

In its prior opinion, this Court observed that common words—if used in a suggestive manner—are accorded protection against

similar marks. The Court found that *Playmen* was (in terms of appearance and suggestion) as close a mark to *Playboy* as was possible without outright duplication. The Court noted that plaintiff had diligently defended its mark against competing uses, and rejected defendants' claim that, because other magazines use "Play" as part of their titles, customers are accustomed to distinguishing similar marks and are unlikely to be confused by *Playmen*. The Court found that the other magazines using "Play" in their titles appealed to different markets than did *Playboy*, and it held that defendants had failed to prove that those magazines had diluted the strength of the *Playboy* mark. *PEI* at 421–24.

Defendants have presented no evidence that contradicts these findings. Their witness Hayes, in fact, recognized that the other magazines with "Play" in their titles are readily distinguishable from *Playboy* and *Playmen*, largely because of the different consumer groups to which they appeal. Transcript at 289, 299.

### C.  Similarity of the Products

The Court found that *Playmen* was similar to *Playboy* in terms of content, format, and appearance, and that the differences between the magazines were superficial. Furthermore, other magazines with similar attributes bore marks quite distinctive from *Playboy*. *PEI* at 424–25.

One of defendants' principal arguments in opposition to issuance of a permanent injunction is addressed to this issue. Defendants claim "that there is at present no *Playmen* magazine and that no decision at all has been made as to the content of such a product"; inquiry into product similarity or likely confusion is therefore "a meaningless exercise." Defendants' Post-trial Memorandum at 3.

This contention is neither supported by the evidence nor sound as a matter of law. It is true that defendants—once apprised of

---

2. Defendants moved to exclude evidence received during the preliminary injunction proceedings on the ground that the earlier proceedings involved *Playmen* magazine, whereas

no such magazine is currently being published. Evidence submitted with respect to preliminary relief may properly be considered in ruling on permanent relief. Fed.R.Civ.P. 65(a)(2).

the Court's intention to issue a preliminary injunction—did not publish their magazine as *Playmen*. The reason for the change of title, however, was not defendants' repentance for their infringing deeds, but rather the impending compulsion of this Court. Defendants have stipulated that, "[b]ut for this Court's issuance of the preliminary injunction in this action, defendants would now be publishing and distributing *Playmen* (U.S.) in this country and throughout the English speaking world." Joint Pre-trial Order ¶ IV(10). Similarly, Adelina Tattilo, president of defendant Tattilo Editrice SPA, testified: "If I didn't have this injunction prohibition to publish under this title nowadays, I would have a publication in America which would be called *Playmen*, but I have the injunction and, therefore, I made another title." Transcript at 236; *see id.* at 194–95 (similar statement).

This is not a situation in which a defendant promises not to engage in future acts of infringement; rather, defendants here merely claim that they are unsure as to their future plans. Furthermore, the evidence undermines even this modest assertion; defendants' officers were evasive, and in some instances incredible, with respect to future publication of a *Playmen* magazine. Tattilo avoided answering whether she had decided to publish a magazine named *Playmen* if the injunction were dissolved; though she initially stated that there "had been a decision as to the contents" of a future *Playmen*, she immediately changed her answer. Transcript at 196–97. Tattilo was similarly evasive under cross-examination:

Q. If you were allowed to publish under the *Playmen* title, would you publish a magazine directed toward the male sophisticate market?

A. At this moment I could not answer it yes or no. I didn't have many satisfactions in the United States. All I do is go back and forth and I suffer. I don't have many joys and satisfactions. Therefore, to start another publication, I don't know, I have to think.

Q. Perhaps I can address it this way: would you permit anyone to publish a magazine under the *Playmen* title which was not like your *Playmen*-Italy magazine?

A. I would not allow anybody to publish a magazine under the title *"Playmen"* without me.

Q. That doesn't answer the question.

A. What was the question?

Q. Would the *Playmen* publication be of the type as your *Playmen*-Italy magazine?

A. It is a question which concerns in the future and I cannot answer to the future. At this moment all I can say is that *I never thought of putting out another newspaper here besides the one is already here*, which is called *Adelina*.

Q. If you are not enjoined from use of the title *"Playmen,"* is it your intention to publish and distribute a *Playmen* magazine in this country?

A. If I didn't have this injunction prohibition to publish under this title nowadays, I would have a publication in America which would be called *Playmen*, but I have the injunction and, therefore, I made another title.

Q. If the injunction were lifted tomorrow, would that *Playmen* publication be similar to your Italian *Playmen* magazine today?

A. You want me to answer on something I already answered. If you talk to me about tomorrow and the Court tells me I can use the title *Playmen*, I will think of it. I cannot answer today for what is going to happen tomorrow.

Transcript at 235–37 (emphasis added). Two facts emerge from Tattilo's testimony: she has never considered publishing in the United States a magazine other than that entitled *Adelina* ; and the sole reason for changing that magazine's title from *Playmen* to *Adelina* was this Court's injunction. Thus, even accepting as true Tattilo's claim that she has not definitely decided upon the contents of a future *Playmen*, there is at least a fair likelihood that, if permanent relief is denied, defendants will revert to calling their magazine *Playmen*.

The testimony of Seymour Butan, board chairman and chief executive officer of defendant Chuckleberry, similarly undercuts defendants' assertions of uncertainty as to their future plans. Butan claimed that "I really don't know" whether Chuckleberry would publish *Playmen* if allowed to by this Court. Transcript at 254. Under cross-examination, Butan admitted that Chuckleberry was obligated to pay Tattilo Editrice SPA a minimum annual license fee of $35,000 for the right to use the *Playmen* mark. The following exchange occurred:

Q. Sir, you would pay for the right to use *Playmen* notwithstanding the fact that you have no present intention to use *Playmen*, is that right?

A. That is true.

.   .   .   .   .

Q. Is part of the value of that gamble the possibility that you will be able to use *Playmen* in the future?

A. No.

Q. Do you have a practice of paying hundreds of thousands of dollars on things that don't have value to you?

A. I have been known to do crazy things like that, yes, sir.

*Id.* at 257–58. Butan's claim that he would continue to pay sizable annual license fees, with no intention of publishing *Playmen*, strains credulity.

Based upon the evidence presented (and the vigor with which defendants persist in seeking approval of the *Playmen* mark), the Court finds that there is a substantial likelihood that, absent a permanent injunction, defendants would publish a *Playmen* magazine that would be similar, if not identical, to *Adelina*.

Even accepting arguendo defendants' factual claims, however, their argument would be unavailing. If accepted, their reasoning would undermine the efficacy of the Lanham Act and would generate incalculable burdens for the judicial system. An infringer who had complied with a preliminary injunction could defeat permanent relief by disavowing knowledge as to his future plans. Plaintiffs whose motions for permanent injunctions were denied on this rationale would have to reinstitute litigation when the infringer acted on its previously "uncertain" plans. A court that denied relief on the grounds advanced by defendants might well have to conduct additional proceedings every time the purported infringer revised his intentions. *Cf. Blisscraft of Hollywood v. United Plastics Co.,* 294 F.2d 694, 702 (2d Cir. 1961) (granting injunctive relief even though defendant discontinued infringing use five months prior to filing of suit).

Thus, with respect to product similarity, the relevant comparison is between *Playboy* and the current incarnation of defendants' publication, entitled *Adelina*. Tattilo has conceded that "the magazine that was supposed to be published as *Playmen* was, in fact, published under the title *Adelina*." Transcript at 195. Defendants have presented no evidence that contradicts the Court's earlier finding of substantial similarity between *Playboy* and defendants' magazine.

D. *Defendants' Purpose in Adopting the* Playmen *Mark*

Plaintiff demonstrated at the preliminary injunction hearing that defendants adopted the *Playmen* mark with the intent of causing confusion and obtaining unfair commercial advantage, and that a presumption therefore arose that the *Playmen* mark resulted in confusion and deception. An intent to profit from confusion seems likely to have motivated Tattilo Editrice SPA's predecessor when it began publishing *Playmen* in Italy in 1967. *Playmen* had no reputation or recognition value in the United States, and so defendants' assertion that they were merely attempting to trade on *Playmen's* international reputation was found untenable. *PEI* at 425–26.

The evidence at trial reinforces those findings. With respect to the genesis of *Playmen*, Tattilo's testimony provided strong evidence that the publishers sought to take unfair advantage of the *Playboy*

mark.[3] Tattilo claimed not to know why she and her employees had chosen the title *Playmen.* Transcript at 193. She could not name any magazine, other than *Playboy*, that had several features similar to *Playmen's*, nor could she explain the striking similarities between the two magazines. *Id.* at 209–16. Under close questioning, Tattilo placed full responsibility on her employee in charge of graphics, suggesting at best that *he* may deliberately have appropriated various features from *Playboy.*

A. I want to say something: by this if you want to make me say that there are similar things [between *Playmen* and *Playboy*], probably, the graphics, a man who traveled, *probably he took an inspiration, he must have seen other newspapers,* I don't know.

. . . . .

Q. In the graphics to which you referred, were the similarities inspired, I believe was your word, by whoever did the graphics having seen *Playboy* magazine?

. . . . .

A. This is his experience. I don't know what his experience.

. . . . .

Q. Are you aware of any other male sophisticate magazine in 1967 which included as a feature a playgirl-of-the-month-type feature?
A. No. *Probably the expert, the one in charge of graphics must have looked at other publications,* is all that I can say. . . . Therefore, it is probably my graphic, the man I had in charge of it, *he inspired himself to a prototype,* an universal type of these magazines because they are all like that.

. . . . .

Q. So that if we find similarities between *Playboy* and *Playmen* at that time in question, do you have any explanation for those similarities?

. . . . .

A. It was a ruse due to his experience, to the experience of the graphic, to the director of graphics' experience, he did not tell me how his experience matured. He only translated it into a paper.

*Id.* at 214, 216, 219 (emphasis added).

Tattilo's testimony that the publishers of *Playmen* chose that name in order to trade on the Italian magazine's reputation in this country is likewise untenable. *Playmen* had no commercially valuable reputation in the United States. Butan, the chief officer of defendant Chuckleberry, first heard of *Playmen* magazine in August 1980 and had never heard of the Italian *Playmen.* Transcript at 256. Defendants' expert Hayes had not seen *Playmen* until one of defendants' officers showed it to him in connection with distribution in this country. *Id.* at 295.

The Court finds that defendants adopted the *Playmen* mark in order to cause confusion among consumers and to obtain unfair commercial advantage of plaintiff's trademark. Therefore, the Court may and does presume that the *Playmen* mark has resulted in deception and confusion.

### E. Proof of Likely Confusion

The prior hearing led to findings that the strength of the *Playboy* mark, the similarity of the two marks, and the close competitive proximity of the marks, provided strong evidence of likely confusion. In addition to the presumption of confusion created by defendants' purpose, the Court found that, in light of the market's characteristics, three types of confusion were likely: confusion as to product; confusion as to source; and confusion resulting from subliminal or conscious association with plaintiff's trademark. *PEI* at 426–29.

Defendants have failed to undermine these conclusions. Plaintiff's expert Ronald

**3.** Under cross-examination, Tattilo was evasive and, on some matters, was impeached on the basis of her deposition testimony. For example, Tattilo denied knowing of *Playboy* at the time she chose the *Playmen* title. Transcript at 202. When confronted with her prior contradictory testimony, Tattilo changed her answer: "Whether I did know physically the publication, probably yes, I knew that it existed both in Europe and in America." *Id.* at 203–04.

Scott convincingly reaffirmed his prior testimony, concluding that there is a likelihood of substantial confusion between *Playmen* and *Playboy*, particularly among impulse buyers. Transcript at 71, 109. Defendants' expert Hayes largely confirmed Scott's position. Hayes essentially agreed with the four-step impulse buying process, as Scott had described it. *Id.* at 297–99. He refused to contradict Scott's conclusion as to the likelihood of subliminal confusion. *Id.* at 305–06. Hayes said that a consumer who had decided to purchase *Playboy* would not purchase *Playmen* by mistake, *id.* at 283, but plaintiff does not argue to the contrary. Rather, plaintiff is concerned about impulse buyers who have not decided to buy *Playboy*, and Hayes did not rebut Scott's testimony as to likely confusion among such consumers.

Defendants make three arguments with respect to the likelihood of confusion. First, they reiterate their contention that defendants have no precise plans as to the contents of *Playmen* and that "there can be no product confusion due to the fact that there is no product." Defendants' Post-trial Memorandum at 3. This contention is unavailing for the reasons discussed above.

Second, defendants argue that *Playmen* and *Playboy* have competed in Italy since 1971, and that "the lack of confusion in an actual market is significant evidence." Defendants' Post-trial Memorandum at 4. Even assuming the legal relevance of such a showing, defendants have adduced no evidence as to an absence of confusion between the magazines in Italy. Defendants state in their brief that Lee Templeton, plaintiff's senior vice-president, testified that the Italian public has little difficulty choosing between the two magazines. *Id.* at 5. This simply misstates the record. At the page cited by defendants, Templeton testified:

Q. So the Italian public obviously has no difficulty in discerning what is *Playmen* and what is *Playboy* and if they want *Playboy*, they go out and buy it?

A. I think that is a non-sequitor.
Transcript at 151.

Defendants' third contention is that the existence of other magazines with "Play" in their titles establishes that *Playmen* will not create confusion as to source. Defendants' expert Hayes contradicted that assertion by conceding that these other magazines differed from *Playmen* and *Playboy* both in the audiences to which they appealed and in various other features. Transcript at 289, 299.

Based upon the presumption of confusion arising from defendants' purpose, and the evidence presented at both stages of this proceeding, there is substantial likelihood that defendants' publication of a male sophisticate magazine entitled *Playmen* would create consumer confusion and would infringe upon plaintiff's trademark.

Defendants have submitted no evidence that contradicts the Court's earlier findings as to the injuries to the respective parties from the issuance *vel non* of an injunction. Accordingly, plaintiff is entitled to a permanent injunction barring defendants from using the *Playmen* mark as the title of a male sophisticate magazine published, distributed, or sold in the United States.

## II. Use of "Playmen" in a Subtitle

■ Plaintiffs seek to prevent defendants from using the subtitle *"America's Edition of Italy's Playmen."* The findings and conclusions made as to the strength of the *Playboy* mark, the similarity of the *Playmen* and *Playboy* marks, and the similarity of the two products, with respect to the *Playmen* title, apply with equal force to the subtitle issue. The remaining questions are defendants' purpose in adopting the subtitle and the proof of likely confusion.

### A. Defendants' Purpose in Adopting the Subtitle

Defendants claim that they are using the *Playmen* subtitle to benefit from the international reputation of Adelina Tattilo and the Italian *Playmen*. Defendants' Post-trial Memorandum at 15. Yet, as discussed above, defendants offer no proof that the

Italian *Playmen* has a significant reputation or commercial value in this country; the testimony of defendants' witnesses Butan and Hayes confirm the absence of such reputation. Transcript at 256, 295. Indeed, Butan—the chief officer of defendant Chuckleberry—could offer no reason for defendants' adoption of the subtitle. *Id.* at 256. If defendants' aim were truly to trade on Tattilo's reputation—which itself was never shown to be significant—then their subtitle would refer to her instead of to *Playmen.*

Moreover, defendants' subtitle is not even accurate: *Adelina* is not simply an English-language edition of the Italian *Playmen.* Defendants assert that *Adelina* "is, in fact, a faithful reproduction of various *Playmen* magazines as published in Italy (Tr. ____)." Defendants' Post-trial Memorandum at 13. Defendants' failure to insert the supporting page of the transcript is understandable, for no such page exists. Tattilo conceded that she does not review the material in *Adelina* that originates in the United States. Transcript at 246. After declining, and being directed, to answer whether she had reviewed the latest issue of *Adelina*, Tattilo answered, no. *Id.* at 246–48. When asked if she "would consider that as an American edition of Italy's *Playmen*," Tattilo answered, "It is not yet as Italy *Playmen, Playmen-Italy.*" *Id.* at 248.

Plaintiff's expert witness Scott provided more credible—and unrebutted—evidence as to defendants' purpose:

> There has been, in my opinion, an effort to link the titles *Playmen, Playboy* and *Adelina;* in a manner which reinforces a number of things: first, an attempt to link *Adelina* with *Playmen* and, second, by the linking of *Playmen* with *Playboy*, to raise the level of the anticipated quality of the product at the level of the consumer and through the [chain] of distribution.

Transcript at 54–55. Plaintiff's witness Templeton offered similar testimony:

> Q. What do you think the effect of the subtitle would be on purchasers?
>
> . . . . .
>
> A. I said earlier that a subtitle exists to qualify in some way the title. Subtitles always exist for a reason. This is some of the most valuable real estate in the world, the cover of a magazine. You don't have much of it and it has to work for you very hard and you put things on that cover that will work for you, and work in this case means to help sell the magazine and, still further, in the case of *Adelina*, this subtitle helps sell it by borrowing a play on the word that is our name.
>
> . . . . .
>
> Q. I would think it is pretty obvious when someone says something is published in Italy, at least one step in the purpose of the subtitle would be to associate *Adelina* with *Playmen* of Italy, and to that extent—do you agree with that?
>
> A. That is one—
>
> Q. That is one step. What is the next step? Is there a next step?
>
> A. Let me take it the way you started it, your Honor. The first step would be to identify it with Italy's *Playmen*. That [would have] virtue, conceivably, if *Playmen* was a well-known, prestigious magazine in this [country] so that association would enhance sales. There is no evidence that that is the case and in the preliminary hearing I believe there was quite a bit of evidence that Italy's *Playmen* was like hen's teeth in this country. You say, "All right, I have a subline and I will spend money to promote it to remind people of what it might mean someplace else." That would be a multi-million dollar job, obviously, and I am not aware of any such promotion. Therefore, I am left to conclude they are piggy-backing on our name.

Transcript at 133–35.

This testimony was unrebutted. Butan claimed not to know why defendants chose this subtitle. Transcript at 256. Tattilo explained that the title *Adelina* was chosen "to identify it with my person," *id.* at 195, but gave no reason for the subtitle.

Plaintiff has submitted evidence, moreover, showing that defendants' promotional materials have repeatedly linked *Adelina* to *Playmen*, thus further benefitting from the association with plaintiff's mark. *See* Transcript at 22–24; Plaintiff's Exs. 68, 70–73, 75. Defendants' failure to produce numerous documents related to their promotion of *Adelina*, on the ground that they could not find the records, supports the inference that defendants have promoted *Adelina* in such a way as to trade on the *Playboy* mark. The evidence therefore amply justifies a finding that defendants adopted the subtitle *America's Edition of Italy's Playmen* in order to cause confusion among consumers and to obtain unfair commercial advantage of plaintiff's trademark; a presumption of confusion is therefore appropriate.

### B. *Likely Confusion from the Subtitle*

At the trial, plaintiff presented additional evidence of likely confusion, primarily from subliminal association. Plaintiff does not claim that use of the subtitle will create confusion between *Playboy* and *Adelina* as to product. Plaintiff's expert Scott agreed that "[t]here is zero likelihood of confusion as to product." Transcript at 70. The likelihood of confusion as to source, though greater, is not substantial; Scott estimated it at ten percent or less, *id.*, which the Court understood to mean that some, but relatively little, confusion would occur.[4]

Plaintiff's concern with respect to the subtitle is that it would unfairly allow defendants to obtain a toehold in plaintiff's market by exploiting a subliminal or conscious association with *Playboy*. As defendants' expert Hayes recognized, the "*Playboy* Image" carries a connotation of "[g]reat style, great class, excellent publication, the rabbit is part of the image, the clubs, etc." Transcript at 317. Plaintiff's expert Scott provided unrebutted testimony that the subtitle created a danger of continued subliminal reinforcement and that de-

fendants had linked the titles *Playmen*, *Playboy*, and *Adelina* "so as to raise the level of anticipated quality of the product." *Id.* at 53–54.

The precise extent of this subliminal confusion cannot be determined, but the witnesses agreed on the importance of subtitles in selling magazines. Defendants' expert Hayes testified:

Q. Do you think subtitles are important?

A. On the cover?

Q. Yes.

A. Yes.

Q. Why are they important?

A. Because I think they lead a lot to impulse sales. By seeing a certain subject covered that you are interested in and want to know about, you will pick up the magazine.

Transcript at 313–14. Similarly, plaintiff's witness Templeton testified that subtitles were used to help sell magazines and that, "in the case of *Adelina*, this subtitle helps sell it by borrowing a play on the word that is our name." *Id.* at 133.

Absent an injunction, the prominence of the word *"Playmen"* in the subtitle—and thus the degree of consumer confusion— might well increase. Plaintiff's expert Scott, examining all of the issues of *Adelina*, reviewed the changes in placement, composition, and contrast of the subtitle in comparison with the title. For example, the subtitle was originally below and to the left of the title; it was subsequently moved above, and centered over, the title. The respective sizes and color contrasts of the title and subtitle also changed. Transcript at 12–15. Scott concluded that "[t]he magazine is moving to a more prominent position of '*Playmen*' as opposed to '*Adelina*.'" Asked about the effect of those changes on consumers, Scott replied: "If it is drawing the public's attention more to the word '*Playmen*' than to the word '*Adelina*,' it is in its way making it more likely for there to be confusion as to source." *Id.* at 16. Scott's analysis, in conjunction with a view-

---

**4.** The Court ordered defendants to produce consumer correspondence that might demonstrate such confusion. Of the four letters produced, one reflected the belief that *Playmen* and *Playboy* came from the same source. Plaintiff's Ex. 78D.

ing of the respective subtitles, was convincing.

Therefore, though the degree of confusion from the subtitle is not so great as that from the *Playmen* title, that confusion would likely increase if defendants were free to use, and to heighten the emphasis on, the subtitle. This might require retrials of the confusion issue every time defendants decided to make *"Playmen"* a little more prominent and *"Adelina"* a little less.

Two factors are of particular importance in warranting an injunction of defendants' use of the subtitle. First, their only plausible purpose in adopting it is to trade on plaintiff's mark; the claim that they are exploiting the Italian *Playmen's* reputation is a sham. Second, in addition to the potential confusion already shown, defendants have indicated a likelihood of attempting to increase the association with *Playboy* whenever possible. Plaintiff is entitled to final, effective protection. Accordingly, defendants are enjoined from using *"Playmen"* in the subtitle, or anywhere on the cover, of a male sophisticate magazine in the United States. The Court need not now enjoin defendants from using *"Playmen"* in the sale, promotion, or distribution of such a magazine, for plaintiff has made no showing that references to the Italian *Playmen* would cause confusion or otherwise damage plaintiff in the absence of the name's appearance in any form on the magazine's cover. If defendants use *"Playmen"* in such a manner as to cause confusion and harm, further relief will be appropriate.

### III. *Extraterritorial Relief*

■ Plaintiff asks the Court to enjoin defendants from using *Playmen* in the title or subtitle of any male sophisticate magazine published in English, French, German, Japanese, Portugese, or Spanish. *Playboy* is a registered mark in the principal countries in which these languages are spoken. Plaintiff seeks such relief pursuant to the Lanham Act, not foreign laws, arguing that extraterritorial relief is justified by the decision in *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 426–31 (9th Cir.

1977). Assuming that *Wells Fargo* should be followed in this Circuit, plaintiff has failed to make an adequate showing under the six factors enunciated in that decision.

Plaintiff has established in its thorough memorandum on foreign law that the policy of the nations affected is consistent with American law. But the nationality and principal place of business of the parties that would be enjoined work against plaintiff. Chuckleberry is a domestic company, but plaintiff offered no evidence that it would be involved in foreign distribution of non-English-language editions of *Playmen*. Tattilo Editrice SPA is an Italian company; its principal place of business is Italy, and plaintiff established that it transacts no business in this country other than licensing use of the *Playmen* and *Adelina* marks.

Plaintiff contends that the foreign nations involved would enforce this Court's order and that several have issued judgments against *Playmen*. If so, then denial of the extraordinary relief sought by plaintiff will not leave it vulnerable to foreign infringement; it can proceed against *Playmen* in those states if and when defendants attempt to publish there. Moreover, plaintiff has not demonstrated that the relative effects of defendants' conduct abroad are greater than the effects in the United States. Plaintiff's assertion that it derives substantial revenue from its foreign-language licensees shows only that it might have interests deserving of protection if and when some effects are actually felt in those nations. Plaintiff has shown that defendants have made some efforts to publish *Playmen* abroad, but plaintiff has failed to demonstrate convincingly that those efforts were intended to hurt commerce in the United States. Defendants' conduct abroad is consistent with an intention to exploit the *Playboy* mark in those nations, but their conduct has been too limited to provide the basis for the inference that plaintiff wants drawn.

Finally, with respect to the relative importance of the violations caused by defendants' conduct in this country as opposed to abroad, plaintiff simply asserts that the

damage abroad is the same as in the United States. But the focus of this litigation has been on infringement and confusion among American consumers. Plaintiff has not submitted the evidence necessary to determine whether consumers in other nations would also be confused by *Playmen*. Even if some violations overseas could be proved, their effects would appear relatively inconsequential compared to the potential effects of violation in this country.

Weighing the six factors deemed relevant by *Wells Fargo*, plaintiff has failed to prove that extraterritorial relief is warranted. Plaintiff has obtained protection of its foreign trademarks from the nations that granted them. Issuance of the requested injunction would needlessly involve this Court in complex, and at this time speculative, foreign activities. Therefore, this aspect of the relief requested is denied without prejudice.

## IV. *Monetary Relief*

■ Plaintiff requests an award of $100,000 in punitive damages, attorney fees, and costs. The request for punitive damages is denied. Plaintiff has offered no proof of any compensable injury. *Cf. Grotrian v. Steinway & Sons*, 523 F.2d 1331, 1344 (2d Cir. 1975) ("A monetary award for past infringement, however, is not an automatic concomitant of the grant of injunctive relief against future infringement."). Defendants complied with the precise terms of the preliminary injunction. When plaintiff objected to defendants' adoption of the subtitle, the Court instructed it to seek a preliminary injunction if it sought to bar the subtitle's use; plaintiff did not do so.

The Lanham Act was amended in 1975 to authorize an award of attorney fees to prevailing parties "in exceptional cases." 15 U.S.C. § 1117. Prior to that amendment, courts could not award attorney fees in trademark or unfair competition cases. *See Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967); *W. E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 665 n.5 (2d Cir. 1970). The Senate Judiciary Committee ad-

vocated the amendment in order to encourage "[e]ffective enforcement of trademark rights [by] the trademark owners.... It would be unconscionable not to provide a complete remedy including attorney fees for acts which courts have characterized as malicious, fraudulent, deliberate, and willful." Senate Report No. 93–1400, 93d Cong., 2d Sess. (1974), *reprinted in* [1974] U.S.Code Cong. & Ad.News 7132, 7136. The Committee stated that "the award of attorney fees would be within the discretion of the court." *Id.* It defined "exceptional cases" as those in which "the acts of infringement can be characterized as 'malicious,' 'fraudulent,' 'deliberate,' or 'willful.'" *Id.* at 7133.

Whether defendants acted deliberately or willfully in infringing plaintiff's mark must be analyzed separately with respect to the *Playmen* title and the *Playmen* subtitle. Defendants' conduct with respect to the *Playmen* title cannot fairly be characterized as exceptional. Although the Court has found that defendants' purpose was to trade on plaintiff's mark, such a finding does not require a finding of deliberateness with respect to the award of fees. Congress' use of the term "exceptional," and the Committee's reference to "malicious, fraudulent, deliberate, or willful" infringement, indicate that a greater showing of culpability is required to justify a fee award than to grant injunctive relief. *See Jones Apparel Group, Inc. v. Steinman*, 466 F.Supp. 560, 564 (E.D.Pa.1979). Defendants were entitled to a judicial determination of the legality of their using the *Playmen* mark, which the Italian courts had permitted in Italy. Similarly, defendants cannot be faulted for opposing issuance of a permanent injunction; to hold otherwise would punish a party merely for refusing to concede defeat.

Defendants' adoption of the *Playmen* subtitle, however, was exceptional. The Court had explained at length why use of that term infringed upon plaintiff's mark. Defendants had been forbidden from calling their magazine *Playmen*. Nevertheless, instead of appealing the preliminary injunc-

tion, defendants adopted the *Playmen* subtitle in hopes of perpetuating their magazine's association with *Playboy*, and for no other purpose; Italian *Playmen* had no domestic reputation from which they could significantly benefit. Though defendants' action did not violate the letter of the preliminary injunction, it amounted to a deliberate effort to undercut the injunction's intended effect. Defendants have acted willfully and deliberately in putting plaintiff to the additional expense of litigating the infringement issue with respect to a new title intended by defendants to achieve at least some degree of the confusion that they originally sought to cause.

An award of fees is made more appropriate by the long history of litigation between these parties. Plaintiff has had to protect its mark around the world against defendants' attempts to exploit *Playboy*'s success. Given defendants' uncertainty as to their future plans, plaintiff may well have to continue relitigating the same issues in forum after forum. Defendants should not be free to inflict these expenses on plaintiff with impunity.

Plaintiff is therefore entitled to such portion of its attorney fees as are attributable to adjudication of the subtitle issue. *Cf. Bowmar Instrument Corp. v. Continental Microsystems, Inc.*, 497 F.Supp. 947, 961 (S.D.N.Y.1980) (awarding attorney fees under Lanham Act only for latter stage of litigation). As the prevailing party, plaintiff is entitled to the costs and disbursements of this entire litigation. Fed.R.Civ.P. 54(d). Defendants' counterclaims are all denied. Plaintiff shall submit a proposed permanent injunction and a statement of fees and costs within twenty days of this opinion; defendants will have ten days to reply.

SO ORDERED.