PLAYBOY ENTERPRISES, INC.,
Plaintiff-Appellee,

v.

CHUCKLEBERRY PUBLISHING, INC.,
Publishers Distributing Corporation, Arcata Publications Group, Inc., Defendants,

Tattilo Editrice Spa,
Defendant-Appellant.

No. 503, Docket 81–7527.

United States Court of Appeals,
Second Circuit.

Argued Jan. 20, 1982.

Decided June 3, 1982.

See also, D.C., 486 F.Supp. 414.

Richard H. Waxman, New York City (Goldschmidt, Fredericks & Oshatz, Barry I. Fredericks, New York City, of counsel), for defendant-appellant.

William F. Dudine, Jr., New York City (Darby & Darby, David R. Francescani, Ethan Horwitz, New York City, of counsel), for plaintiff-appellee.

Before FEINBERG, Chief Judge, and LUMBARD and MANSFIELD, Circuit Judges.

LUMBARD, Circuit Judge:

Tattilo Editrice SPA ("Tattilo SPA"), an Italian corporation which, since 1967, has published in Italy a male sex-oriented magazine entitled "Playmen," appeals from an order of the District Court for the Southern District, Sofaer, J., permanently enjoining its use in the United States of the mark "Playmen" in a title or subtitle for a sex-oriented magazine. Plaintiff Playboy Enterprises, Inc. ("Playboy Enterprises"), publisher of PLAYBOY magazine, brought this action in 1979 under §§ 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a), to obtain injunctive relief and punitive damages after Tattilo had licensed defendant Chuckleberry Publishing, Inc. ("Chuckleberry") to publish an English language version of PLAYMEN in the United States. In addition to granting permanent injunctive relief, the district court awarded $5,000 in attorney fees but denied any punitive damages. 511 F.Supp. 486 (S.D.N.Y. 1981). We affirm because we agree with the district court's finding of a likelihood of confusion between the marks "Playboy" and "Playmen" as titles to similar sex-oriented magazines, and its further finding that use of "Playmen" in a subtitle of defendants' magazine infringes on plaintiff's mark.

I.

The underlying facts are detailed in Judge Sofaer's two opinions, 486 F.Supp. 414 and 511 F.Supp. 486, and need only brief mention here. In 1967, Tattilo SPA began publishing in Italy a male sophisticate magazine entitled "Playmen." Prior to that time, Tattilo SPA published a simi-

lar magazine called "Men." Although the magazine carries the English title of "Playmen" it was written entirely in Italian. In July, 1979, Tattilo SPA announced plans to publish an English language version of PLAYMEN in the United States. Chuckleberry, a New York corporation with offices in New York City, contracted with Tattilo SPA for the exclusive worldwide rights to publish the magazine in the English language. Before Chuckleberry printed the first issue, this suit for injunctive relief was brought by Playboy Enterprises against defendants alleging trademark infringement, 15 U.S.C. § 1114(1), false designation of origin, 15 U.S.C. § 1125(a), unfair competition based on infringement of plaintiff's common law trademark rights, and violations of the New York Anti-Dilution Statute, N.Y.Gen.Bus.L. § 368–d (McKinney's 1969).[1]

Plaintiff Playboy Enterprises, a Delaware corporation based in Chicago, Illinois, has published the well-known male entertainment magazine PLAYBOY since 1953. PLAYBOY is now read by over 5.5 million people in the United States alone and annually generates more than $60 million in advertising revenues. The magazine is sold throughout the world in many foreign languages. Playboy Enterprises has owned the registered trademark "Playboy" for use on a monthly magazine since 1954 and subsequently has registered the same trademark for other uses, including on books. In 1958, Playboy Enterprises registered the trademark "Playboy's Playmate of the Month" for its centerfold feature in PLAYBOY magazine and in 1961 registered the trademark "Playmate" for calendars. As part of its lucrative business, Playboy Enterprises has granted the right to use the "Playboy" mark to manufacturers and retailers of numerous products whose sales exceed $82 million.

After commencing this action, Playboy Enterprises obtained a sample copy of the first issue of PLAYMEN that defendants planned to publish. Arguing that distribu-

---

1. Jurisdiction over these claims was based upon federal question jurisdiction and pendent jurisdiction, as well as 28 U.S.C. § 1332 by reason of diversity of citizenship.

tion of this PLAYMEN magazine would infringe their property rights in the "Playboy" mark, plaintiff moved for a preliminary injunction. A three day hearing was held before Judge Sofaer at which defendants presented only exhibits. Several weeks after the hearing, while the motion was *sub judice,* the defendants made an offer to change the name of PLAYMEN magazine to ADELINA with the subtitle "America's Edition of Italy's Playmen" in the hopes of settling the litigation. The defendants asked Judge Sofaer to sanction the use of this new name. Judge Sofaer advised the parties that their request presented an entirely new issue which would have to be litigated, and that he was inclined to issue a preliminary injunction against the use of "Playmen" as a title. He did not at that time address the propriety of any alternative name for defendants' magazine. 486 F.Supp. at 419. Thereafter, Chuckleberry published ADELINA with the subtitle containing the name "Playmen." [2]

On February 6, 1980, Judge Sofaer granted a preliminary injunction against defendants' use of the title "Playmen" for its magazine. 486 F.Supp. 414 (S.D.N.Y.1980). In his opinion, he found that the title "Playmen" was likely to cause confusion among consumers for several reasons. First, he said, "Playmen" is a very similar mark to "Playboy" which is a demonstrably strong mark entitled to a high degree of protection. Second, PLAYMEN magazine was similar in form and content to PLAYBOY and both magazines aimed to attract the same market of consumers, to wit, heterosexual adult males. Third, the district court opined that the defendants offered no credible explanation why they adopted a name so similar to "Playboy" other than to trade on PLAYBOY's widespread popularity. The district court determined that three types of consumer confusion were likely to occur if the defendants published and sold PLAYMEN. First, product confusion would likely result because the consumer's decision to purchase these magazines is often ill-informed and impulsive, whether at a newsstand or in checking off a subscription form. Second, confusion as to source was likely even among those consumers who could tell the magazines apart. Finally, the district court felt that PLAYMEN would result in an amorphous type of confusion described as "subliminal or conscious association with plaintiff's well-known name." 486 F.Supp. at 428. Evidence of this subliminal association was found by the district court in defendants' exploitive purpose in using the "Playmen" mark and in the testimony of plaintiff's expert Ronald Scott who explained that PLAYMEN because of its name and likeness to PLAYBOY could be circulated successfully to distributors for a fraction of the advertising costs typically required to start a new magazine.

Rather than appeal the order granting the preliminary injunction, the defendants requested an expedited trial. In the meantime, beginning in January 1980, the defendants published their male sophisticate magazine under the mark "Adelina" with the subtitle "America's Edition of Italy's Playmen." After the trial on the merits in October, 1980, plaintiff moved for a permanent injunction against the use of "Playmen" in either the title or subtitle of defendants' magazine in the United States and elsewhere. Plaintiff also requested punitive damages, legal fees and costs.

In an opinion dated April 1, 1981, Judge Sofaer awarded a permanent injunction and explained that the defendant had failed to controvert any of the findings of confusion between the PLAYMEN and PLAYBOY magazines upon which the preliminary injunction was based. He stated that the evidence at trial confirmed his earlier determination that defendants' purpose in using the "Playmen" title was to trade on plaintiff's mark.

Judge Sofaer then addressed the defendants' use of the "Playmen" mark in the

---

**2.** In January, 1979, after the commencement of this action, Tattilo's application for registration of the trademark "Playmen" for use on magazines, books and calendars was refused by the United States Patent and Trademark Office.

subtitle of its magazine ADELINA. He reasoned that the defendants' purpose in continuing to use "Playmen," even though in a subtitle, was to trade on PLAYBOY's popularity. Although the likelihood of confusion as to source was "not substantial" according to the district court, confusion from "subliminal association" had the potential of becoming as great as if the defendants' magazine was entitled "Playmen." The district court therefore enjoined defendants' use of "Playmen" as a title or subtitle for a magazine in the United States and awarded attorney fees in the amount of $5,000 for fees attributable to the adjudication of the subtitle issue.

## II.

To warrant an injunction Playboy Enterprises was required to show at trial that the use of the mark "Playmen" title or subtitle of defendants' magazine would likely cause confusion with PLAYBOY magazine within the meaning of §§ 32(1) and 43(a) of the Lanham Act. In reviewing the district court's conclusion that such a likelihood of confusion exists we must determine whether the district court's findings of fact were clearly erroneous, giving due deference to the trial court's opportunity to judge the credibility of witnesses. Fed.R.Civ.P. 52(a). Of course, to the degree that the determination of likelihood of confusion rests upon a visual comparison of the marks and products themselves, the appellate court is in as good a position as the trial judge to decide the issue. *See McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126 (2d Cir. 1979). The "clearly erroneous" standard which governs findings of fact turns on whether a reviewing court has "the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). On this record we hold that the district court's findings as to the strength of plaintiff's mark; the degree of similarity between the marks; the degree of similarity between the products; the purpose of the defendant in adopting its mark as a title and as a subtitle, and the resulting confusion among consumers which would likely be caused by the "Playmen" title or subtitle are all supported by substantial evidence in the record and are not clearly erroneous. Consequently, we affirm.

### 1. *The "Playmen" Title*

Fundamental to any analysis of trademark infringement is an understanding of how consumers make their decisions to buy, or not to buy. *McGregor-Doniger, Inc. v. Drizzle, Inc., supra*, 599 F.2d at 1137. In the purchase of a magazine, a four step process is usually involved according to the uncontroverted testimony of plaintiff's expert Ronald Scott. First, the consumer views the product on the newsstand where often only the left hand portion of covers are exposed; second, the consumer picks up the product and scans the entire cover which is specifically designed to attract his attention; third, the consumer opens the magazine to examine the contents, and fourth, in the case of sex-oriented magazines, the consumer flips to the center of the magazine or centerfold if one exists. This process takes only a few seconds and the ultimate decision to buy is typically "impulsive." When viewed in the context of this four step process the evidence in this case supports the district court's conclusion that PLAYMEN's presence on newsstands would result in confusion.

■ The district court's finding that the "Playboy" mark was distinctive and enjoyed wide recognition is uncontroverted. Moreover, "Playboy" is a mark of great value, due in large part to the long standing success of PLAYBOY magazine. We agree with the district court that the "Playboy" mark is suggestive rather than descriptive and as such is entitled to protection without proof of secondary meaning. *McGregor-Doniger, Inc. v. Drizzle, Inc., supra.* Playboy is defined in the Random House Dictionary of the English Language (unabridged ed. 1966) as "a wealthy, carefree man who devotes most of his time to leisure, self-amusement, and hedonistic pleasures, conventionally frequenting parties

and night clubs, romancing a rapid succession of attractive young women, and racing speedboats and sports cars." Although the word may signify the aspirations of PLAYBOY's readership, it does not describe the product or its contents. Also, the "Playboy" mark has been registered by the United States Patent and Trademark Office, which further indicates that the mark is not merely descriptive and gives to it a strong presumption of validity. 15 U.S.C. § 1057(b).

The defendants utilized a mark that is similar in several respects to "Playboy." Both titles have the same prefix "Play." Moreover, if the word "Playmen" means anything (unlike "Playboy" it does not appear in any dictionary), it appears to describe the same hedonist who is a playboy, perhaps grown older. Thus, defendants have chosen a word with a similar meaning to "Playboy" to describe their similar product. We have previously stated that "[o]ne who adopts the mark of another for similar good acts at his own peril and any doubt concerning the similarity of the mark must be resolved against him." *American Home Products Corp. v. Johnson Chemical Co.*, 589 F.2d 103, 197 (2d Cir. 1978). Simply stated, the title "Playmen" comes as close as one could to the "Playboy" title. As will be discussed, this also is the obvious purpose behind its use.

Several features of defendants' use of the "Playmen" mark entitle plaintiff to an injunction. First, both parties' magazines appeal to the same consumer group, *i.e.*, heterosexual adult males. Among this group, PLAYBOY has acquired great distinctiveness. This fact alone creates a strong likelihood of confusion between the usage of the two marks. Second, the similarity of the magazines contributes significantly to a likelihood of confusion. Both magazines utilize the same cover layout consisting of the magazine title across the top, a picture of a young woman and the titles of articles appearing along the sides. Inside, both magazines contain numerous photographs of nude or scantily-clad women. The table of contents page on both publications is virtually identical in graphic design, layout and print type. Also, PLAYMEN utilizes a distinctive feature long employed by PLAYBOY: a three-page centerfold photograph of a female model. PLAYBOY calls this feature "Playmate of the Month" while PLAYMEN calls its centerfold "Woman of the Month." Both magazines also contain short stories, salacious cartoons, interviews with celebrities, and other features.

The district court's conclusion that product and source confusion will result from these similarities is supported by the evidence. With regard to product confusion, purchasers of male sex-oriented magazines are impulsive buyers at the newsstand and therefore could readily mistake the two products and purchase PLAYMEN thinking it was PLAYBOY. The evidence includes several letters which were written by purchasers of PLAYMEN to either Playboy Enterprises or PLAYMEN indicating that they thought they were purchasing a PLAYBOY Magazine.

More significant on the record before us, however, is the evidence of confusion as to source. Any confusion as to source by a consumer depends upon an examination of the entire magazine. According to plaintiff's expert Scott, who was credited by the district court, the quality of a magazine, as well as its name, are important factors in the creation of any source confusion. The similarities of PLAYMEN to PLAYBOY in its content and quality would likely result in consumers believing that the former was sponsored by the latter. We find valid the analogy the district court drew between the case at bar and consumers' proven belief that PLAYGIRL, a sex-oriented magazine aimed at female heterosexuals, was developed by Playboy Enterprises to attract the untapped female markets.

Source confusion is further evidenced by what the district court labeled "subliminal association." In essence, this is an exploitation by defendants of consumers' recognition of the PLAYBOY name and of PLAYMEN's likeness to it. Judge Sofaer's observation on this point, based primarily on the testimony of plaintiff's expert Scott, was:

"Whereas the average consumer might be less motivated to pick up PLAYMEN if it were named, for example, ADONIS, he is more likely to take notice of PLAYMEN on the newsstand because of an association, if not outright confusion, with the PLAYBOY mark," 486 F.Supp. at 428. Scott, who had himself promoted over one hundred new magazines, also testified that promotion of a magazine whose name and likeness is similar to PLAYBOY would be relatively inexpensive. Because of PLAYMEN's likeness to PLAYBOY, Scott opined that distributors would be willing to handle PLAYMEN with about half the budget typically necessary to promote a new magazine on the expectation that consumers would associate the magazine with PLAYBOY. Scott testified that PLAYMEN has engaged in a promotional campaign costing under $50,-000, a modest sum when marketing a new magazine.

What we have said disposes of appellant's principal contentions. The appellant argues that the use of a common word which appears in the dictionary permits any second user to utilize a similar but different word to name its similar product. It is urged that any literate person would be able to distinguish the two names and the magazines themselves. Appellant cites *Affiliated Hospital Products, Inc. v. Merdel Game Manufacturing Co.*, 513 F.2d 1183 (2d Cir. 1975), where we held that a defendant's use of the name "Kick'er" for a tabletop soccer game did not infringe plaintiff's mark "Kik-it" used for the same purpose. In that case, we stated that the plaintiff could not "claim exclusive rights over every variation of the word 'kick'". 513 F.2d at 1188. Appellant argues that similarly plaintiff cannot claim an exclusive right to all titles using the prefix "play." The case of *Affiliated Hospital Products*, however, is inapplicable to the facts here because unlike "Playboy" the "Kik-it" mark never achieved a high degree of distinctiveness prior to KICK'ER's introduction into the market for tabletop soccer games, a market which had contained at least three soccer games that used a variation of the word "kick". 513 F.2d at 1188 n. 10. Prior to

PLAYMEN's publication only PLAYBOY used an appellation with the syllable "Play" for a male sex-oriented magazine. PLAYBOY has done this over a period of years and has succeeded in establishing a mark of unique recognition.

It is true that a number of sex-oriented magazines presently use this prefix, with such titles as "Playgirl," "Playbird," "Playguy," and "Players;" however, the existence of these other titles, which PLAYBOY has not sought to enjoin, does not undermine plaintiff's contention that consumer confusion exists as to PLAYBOY and PLAYMEN.

Appellant's insistence that significant distinctions do exist between PLAYBOY and PLAYMEN is not convincing. PLAYMEN uses a round-shaped logo type and red, green and white colored stripes, while PLAYBOY uses both block lettering and a distinctive bunny symbol. PLAYMEN also purports to have more explicit photographs. Although these features diminish the likelihood of product confusion, the products' similarities earlier explained overshadow these distinctions. There do exist other sex magazines aimed at adult male heterosexuals which use much the same cover layout and editorial content as PLAYBOY. These other magazines, however, do not utilize the prefix "Play" in their mark. The magazines that do use the prefix "Play" are distinctive in that they are sex-oriented magazines aimed at entirely different markets. For example, PLAYGIRL is directed at female heterosexuals and PLAYGUY attracts male homosexuals. Although witnesses at the hearings before Judge Sofaer acknowledged that these other magazines might at least create some confusion as to source with PLAYBOY, these other magazines do not taint the conclusion that confusion exists between PLAYMEN and PLAYBOY.

Playboy Enterprises has in fact consented to PLAYGIRL's continued publication and has conceded in a settlement agreement in another lawsuit "that PLAYGIRL in itself is not confusingly similar to

PLAYBOY or PLAYMATE." We agree with the district judge's refusal to view this concession as undermining plaintiff's claim that source confusion exists between PLAYMEN and PLAYBOY. Plaintiff's settlement dealings with PLAYGIRL are not admissible as evidence probative of the issues in this case, see Fed.R.Evid. 408, and in any case, like the other magazine titles which use "Play" as a first syllable, PLAY-GIRL does not present the same likelihood of confusion to the intended purchasers of PLAYBOY.[3]

We are not persuaded by *HMH Publishing Co. v. Lambert*, 482 F.2d 595 (9th Cir. 1973) where the Ninth Circuit affirmed a district court finding that "Playgirl" was not confusingly similar to "Playboy." That decision was based on the fact that both parties' products—in that case night clubs—were so distinctive that no confusion was likely despite the similar names. Here, the significant features of the parties' products are very similar.

■ Nor do we believe it significant that the plaintiff has not presented any evidence of actual confusion between PLAYMEN and PLAYBOY in the Italian market where the two magazines have competed since 1972.[4] Although a trial court may infer from the absence of actual confusion that there is no likelihood of confusion, *Affiliated Hospital Products, Inc. v. Merdel Game Manufacturing Co., supra*, the other evidence in this record shows that this would not be a rational inference. Moreover, lack of any proof of confusion in Italy, because it is a different market, would have only limited probative value in determining whether confusion is likely in the United States.

Finally, the testimony regarding defendant's purpose in adopting the "Playmen" mark supports Judge Sofaer's finding of infringement. We have emphatically stat-

ed that a registrant of a mark is presumptively entitled to protection from a newcomer's use of a similar mark in direct competition, "particularly when no reasonable explanation is offered to show the second comer's need to come so close to the mark." *American Home Products Corp. v. Johnson Chemical Co., supra*, 589 F.2d at 107. At the hearing before Judge Sofaer, Ms. Tattilo, the president of Tattilo SPA, failed to provide any credible explanation for her company's use of the title "Playmen". As Judge Sofaer had the opportunity to observe the witness, we credit his conclusion that Ms. Tattilo's testimony was "evasive" on this point. Tattilo explained that it was probably a "graphics man" for her magazine who came up with the various features of PLAYMEN magazine which are so similar to PLAYBOY magazine. She explained that the name "Playmen" was derived from a predecessor magazine in Italy called "Men." "Playmen" was later chosen for the American magazine ostensibly to trade on the Italian PLAYMEN. This explanation, we believe, was properly discredited by the district judge. There is no evidence that PLAYMEN magazine in Italy had any commercial reputation upon which the American version could trade. As the district court observed, even the chief officer of defendant Chuckleberry had never heard of the Italian PLAYMEN. We agree with the district court that Tattilo's purpose was to trade on PLAYBOY's mark and with its conclusion that the "Playmen" mark would result in deception and confusion.

#### 2. The "Playmen" Subtitle

■ The defendants' use of the name "Playmen" in its subtitle raises different issues from those raised by the "Playmen" title, but we agree with Judge Sofaer that it involves an improper exploitation of

---

**3.** Playboy Enterprises sued defendants in Italy to enjoin the use of the "Playmen" name but failed. The Italian court ruled that lexically "Playboy" was a weak mark and not entitled to protection. Playboy Enterprises was successful, however, in enjoining PLAYMEN in the courts of England, France and West Germany.

**4.** PLAYBOY's Italian circulation is approximately "130 to 135,000 a month" while PLAYMEN's is estimated at 95,000 copies a month.

plaintiff's mark. Appellant points out that the subtitle "America's Edition of Italy's Playmen" on the cover of ADELINA is an accurate, descriptive title which advises consumers that ADELINA is the American counterpart to the Italian PLAYMEN; that the plaintiff's witness Scott testified that the subtitle did not create product confusion and only minimal source confusion, and that Scott testified that subtitles were not significant in affecting a consumer's buying decision. Consequently, the appellant argues, the district court's reliance upon "subliminal association" as a basis for granting the injunction, aside from the presence of source or product confusion, was erroneous.

As the district court observed, the findings and conclusions as to the similarity of the marks and the strength of Playboy's mark apply to the subtitle issue. The remaining question is whether there is a likelihood of confusion among the buying public between a magazine entitled "Playboy" and one entitled "Adelina" with the subtitle "America's Edition of Italy's Playmen." Although Playboy Enterprises concedes that the subtitle would not create any confusion as to product, there is evidence to support confusion as to source. First, experts presented by both parties agree that subtitles are important in selling a magazine. As one expert stated, the cover of a magazine contains precious "real estate," each fraction of which contributes to attracting the prospective buyer. According to appellant's own expert, subtitles are particularly important in contributing to impulse buying. Thus, plaintiff's contend that ADELINA's subtitle helps sell that magazine by reminding customers of PLAYBOY's strong mark. Plaintiff's expert Scott did state that subtitles were not read "with great intensity" by consumers; however, he also stated that depending upon the size of the lettering and the cover positioning of ADELINA's subtitle consumers would more likely notice the word "Playmen" and therefore be confused as to source.

The district court gave significant weight to Scott's testimony that consumers would subliminally associate PLAYMEN, PLAYBOY and ADELINA. Subliminal association as a basis for trademark infringement was recognized by Judge Gurfein in *Londontown Manufacturing Co. v. Cable Raincoat Co.*, 371 F.Supp. 1114 (S.D.N.Y.1974) where he enjoined the use of the mark "Smog" for raincoats because it infringed on the "London Fog" mark. Judge Gurfein explained:

> If consumers come to think of a wire fence as a reminder of a *cyclone*, then a competitor may not remind them of his wire fence as a tornado. *Hancock v. American Steel & Wire Co.*, [203 F.2d 737] *supra*. The reason is that advertising and trademarks rely on impressions. The consumer does not memorize the mark. He has a feeling about it from past exposure. That feeling may be vague, subliminal it is said, but it comes to consciousness when the article is seen with the trademark affixed. *Id.* at 1118.

Judge Gurfein went on to say that the "ultimate test is . . . whether the public is likely to be confused by the similarity of the marks as to the source of the goods." *Id.* This ultimate test is satisfied by the record. Despite Scott's testimony that likelihood of confusion as to source was low, the district court observed that Scott stated that certain placements of the subtitle might draw "the public's attention more to the word "Playmen" than to the work "Adelina" . . . [therefore] making it more likely for there to be confusion as to source." 511 F.Supp. at 494. Judge Sofaer's questioning of Scott clarified this:

> THE COURT: I know that the mind acts swiftly, but I gather you premise your testimony on a two-step connection in the mind of the viewer, that is, he says Adelina published in Italy as Playmen and then he connects Playmen with Playboy and then he confuses Adelina as a result as a product that has its *source* in the publishing empire of Playboy?
>
> THE WITNESS: That's correct, yes, sir. (emphasis added).

Scott concluded his direct examination by stating that "[t]here has been, in my opinion, an effort to link the titles Playmen, Playboy and Adelina, in a manner which reinforces a number of things: First, an attempt to link Adelina with Playmen and, second, by the linking of Playmen with Playboy, to raise the level of anticipated quality of the product at the level of the consumer and through the [chain] ... of distribution." The district judge found Scott's analysis convincing.

We must also give considerable weight to the evidence of defendant's exploitive purpose in adopting the subtitle. The record before us is totally devoid of any justifiable reason for the defendant's decision to adopt the "Playmen" subtitle. For instance, there was no proof that the Italian PLAYMEN, upon whose reputation ADELINA hoped to trade, had any recognition among American consumers. Even defendants' experts conceded this. Also, we agree with Judge Sofaer that the defendant Tattilo's explanation about the attempt to link ADELINA with the Italian PLAYMEN was not credible. We conclude, therefore, that the district judge was not clearly erroneous in finding that the adoption of the name "Playmen" in a subtitle for the purpose of trading on PLAYBOY's mark and in presuming that confusion among consumers would result.

The order of the district court granting permanent injunctive relief is in all respects affirmed. The award of $5,000 for attorney fees is also affirmed. We agree with the district judge that the defendants' use of the "Playmen" subtitle was "exceptional" within the meaning of the Lanham Act, 15 U.S.C. § 1117 and therefore warrants the award of fees. The subtitle was adopted in the face of a preliminary injunction against the title "Playmen" and was part of defendant's continuing attempt to trade on the "Playboy" mark. The $5,000 is a reasonable amount to be assessed for litigation over the subtitle issue. As we do not find the appeal frivolous, we deny the appellee's request for costs under Fed.R.App.P. 38.

MANSFIELD, Circuit Judge (concurring in part and dissenting in part):

Although I concur in upholding the injunction against use of the title PLAYMEN, I do not subscribe to some of the reasoning of the majority and of the district court, particularly the reliance upon the concept of "subliminal association," which in my view only seems to confuse rather than to clarify. In addition, I dissent from the majority's affirmance of the injunction against the use of "Playmen" in the much smaller subtitle of the appellant's male sophisticate magazine ADELINA (see Appendices A and B hereto, showing typical front pages of both magazines). In my view the subtitle poses no substantial likelihood of confusing an "appreciable number" of consumers. *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1138 (2d Cir. 1979). Accordingly, I would reverse the broader injunction and the award of attorneys' fees.

The ADELINA and PLAYBOY titles, printed in equivalent large-sized block type letters across the tops of their respective magazine covers (see Apps. A & B), look nothing alike. Even when only the top left corners of the covers are visible, as is typical at a newsstand overlapped display, the first three letters of the two titles are completely different. There is thus no reasonable possibility that upon a quick glance, which is the first step in the four-step "impulse buying" process, a consumer would confuse the two publications. This is fully supported by the testimony of Playboy's own expert Scott, who acknowledged unequivocally that "[t]here is zero likelihood of confusion as to *product*" (emphasis added). Scott also testified that any potential confusion as to *source* (i.e., that PLAYBOY sponsors ADELINA) caused by the subtitle "America's Edition of Italy's Playmen" is "tremendously less than" would be caused by the much larger title PLAYMEN. He quantified the extent of the possible source confusion at "[l]ess than ten per cent." Scott's testimony, considered along with the absence of any evidence of actual consumer confusion between ADELINA (several issues of which were marketed in the U.S.)

and PLAYBOY, should have precluded a finding of likelihood of appreciable confusion arising from the subtitle.

The majority and the district court base their contrary conclusion on several considerations. First, and foremost, the majority endorses the district court's finding that by reason of the subtitle consumers will be confused by "subliminal trademark association," 486 F.Supp. at 428, which defendants could exploit to gain a toehold in Playboy's market.[1] Even assuming the validity and viability of this amorphous concept of "subliminal confusion," its importance when applied to the small subtitle is highly dubious since Scott testified that subtitles play a minimal role in the consumer's purchasing decision.[2] More significantly, the prior decision relied on for the concept of subliminal confusion, *Londontown Manufacturing Co. v. Cable Raincoat Co.*, 371 F.Supp. 1114 (S.D.N.Y.1974), referred to subliminal association merely as a psychological explanation of product or source confusion, and never viewed it as a separate *type* of confusion that could independently warrant a finding of infringement.[3] It is error to assign such independent significance to psychological speculations of this sort in light of Scott's unqualified denial of any product confusion and any appreciable source confusion.

Second, the majority and the district court give great weight to the defendant's "exploitive purpose in adopting the subtitle." Maj. Op. 571. I have trouble with various aspects of the district court's finding that Tattilo adopted the PLAYMEN title and later the subtitle with the intention of causing and trading on any possible consumer confusion. For instance, in its first opinion the district court relied on a *Time* magazine article about the genesis of appellant's Italian PLAYMEN in 1967, which is hardly reliable, much less admissible, evidence of Tattilo's intent. 486 F.Supp. at 425. In its second opinion, the district court stated erroneously that "Tattilo claimed not to know why she and her employees had chosen the title *Playmen.*" 511 F.Supp. at 491. In fact, she explained that in 1967, when PLAYBOY was still banned in Italy, she chose the title PLAYMEN to provide reader identification with the pre-existing magazine MEN published by her.

In the end, the "proof" of bad intent relied upon by the majority and the district court consists of Tattilo's *failure to disprove* an intent to confuse. While I agree that the use of a similar mark may sometimes give rise to an inference of bad intent absent a reasonable explanation, mere similarity cannot constitute conclusive proof. "In no case [has this Court] determined a senior user's right to injunctive relief solely on the basis of the similarity of the marks and the proximity of the products." *Vitarroz v.*

1. The fact that appellants may be able to enter the market with substantially less in advertising expenditures than Playboy has undertaken throughout the years to acquire its reputation is not a dispositive factor establishing infringement. *HMH Publishing Co., Inc. v. Lambert*, 482 F.2d 595, 598 (9th Cir. 1973) (quoting *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 800 (9th Cir. 1970)).

2. It is significant that the district court first created the category of subliminal confusion with reference only to the PLAYMEN title, where the likelihood of source confusion was far greater than for the subtitle and was by itself sufficient to warrant a finding of infringement. 486 F.Supp. at 428–29.

3. The full passage from *Londontown Manufacturing Co. v. Cable Raincoat Co.*, 371 F.Supp. 1114, 1118 (S.D.N.Y.1974), is as follows, with the sentence omitted in the district court's opinion italicized (see 486 F.Supp. at 428):

"If consumers come to think of a wire fence as a reminder of a *cyclone*, then a competitor may not remind them of his wire fence as a *tornado*. [Citation omitted]. The reason is that advertising and trademarks rely on impressions. The consumer does not memorize the mark. He has a feeling about it from past exposure. That feeling may be vague, subliminal it is said, but it comes to consciousness when the article is seen with the trademark affixed. *The ultimate test is, of course, whether the public is likely to be confused by the similarity of the marks as to the source of the goods.* (Latter emphasis added).

*Borden*, 644 F.2d 960, 966 (2d Cir. 1981). See, e.g., *id.* ("BRAVOS" chips does not infringe "BRAVO's" crackers); *Affiliated Hospital Products, Inc. v. Merdel Game Manufacturer's Co.*, 513 F.2d 1183 (2d Cir. 1975) ("KICK'ER" and "KIK-IT" allowed for similar table-top soccer games); *Beech-Nut Inc. v. Warner-Lambert, Inc.*, 480 F.2d 801 (2d Cir. 1973) ("BREATH SAVERS" and "BREATH PLEASERS" allowed for similar breath mints).

Even assuming, however, that there was adequate proof of Tattilo's bad intent, this only gives rise to a *presumption* of the ultimate fact to be proved—the actual likelihood of confusion. See *Perfect Fit Industries, Inc. v. Acme Quilting Co.*, 618 F.2d 950, 954 (2d Cir. 1980). Such a presumption must yield in the face of evidence bearing more directly on the issue of likelihood of confusion. Here, Scott's clear testimony and the absence of any proof of actual confusion constitute evidence requiring the rejection of such presumed confusion.

Third, the majority and district court rely on those factors justifying the injunction against the PLAYMEN title as further support for the injunction against the use of "Playmen" anywhere on the magazine's cover. Such evidence, less than overwhelming even when considered with respect to the PLAYMEN title, provides little support for the general injunction against use of the word in a subtitle which is less than one-eighth the size of the title ADELINA and even there refers only to "America's Edition of *Italy's* Playmen" (emphasis added). Appellant is permitted by law to publish PLAYMEN as the magazine's main title in Italy.[4]

Although PLAYBOY and PLAYMEN have competed head-to-head in Italy since 1972, with monthly circulations of roughly 135,000 and 98,000, respectively, Playboy, which had the burden of proof, introduced no evidence of actual confusion aside from a few readers' letters. Nor did it conduct a market survey, which would be the most probative evidence, to test for any confusion between PLAYBOY and PLAYMEN or ADELINA and, if so, whether it was substantial. The burden is not on appellant to prove a negative, i.e., the absence of confusion. To the contrary, a plaintiff's failure to prove actual confusion justifies an inference that there is no likelihood of confusion. *McGregor-Doniger Inc. v. Drizzle Inc., supra*, 599 F.2d at 1136. Moreover, there is currently a proliferation of magazines using the prefix "PLAY," many of which are sex-oriented magazines that have been registered (e.g., "PLAYGIRL," "PLAYGUY," "PLAYERS," "PLAY-THINGS"). While the fact that some of these appeal to different consumer markets may minimize the possibility of *product* confusion, Scott testified, and readers' letters confirmed, that these magazines are just as likely as the PLAYMEN title to engender confusion as to source.[5] Yet the Ninth Circuit, in *HMH Publishing Co., Inc. v. Lamber*, 482 F.2d 595, 597 (9th Cir. 1973), affirmed a finding of the district court that "the name 'Playgirl' is not confusingly similar to, nor would it be likely to cause confusion to members of the public with either 'Playmate' or 'Playboy.'" Moreover, a later suit by PLAYBOY in the Northern District of Illinois against Lambert, the publisher of PLAYGIRL, was dismissed with prejudice, but without payment, pursuant to a settlement agreement in which both agreed that the mark "Playgirl in itself is not confusingly similar to Playboy or Playmate."

---

4. The Italian courts have denied PLAYBOY any protection against appellant's use of the title PLAYMEN in Italy.

5. In this regard both the majority and the district court take somewhat inconsistent positions. While they discount the proliferation of "PLAY____." magazines on the ground that they are directed at different audiences than PLAYBOY and PLAYMEN, they nevertheless rely on evidence of confusion as the source concerning PLAYGIRL in the form of readers' letters to support their conclusion about confusion as to source caused by the use of "Playmen."

Thus the prevalance of competing or related magazines using titles with the "PLAY" prefix reduces the distinctiveness of Playboy's mark and the degree of protection to which it is entitled. See Callman, 3 Unfair Competition Trademarks and Monopolies § 82.1(1) at 759 n.42 (3d ed.). See, e.g., *Beech-Nut Inc. v. Warner-Lambert, Inc., supra,* 480 F.2d 801; *Durox Co. v. Duron Paint Manufacturing Co.,* 320 F.2d 882 (4th Cir. 1963); *Triumph Hosiery Mills, Inc. v. Triumph International Corp.,* 308 F.2d 196 (2d Cir. 1962). Finally, even with respect to the PLAYMEN title the likelihood of product confusion is limited by what Judge Sofaer found to be "[a] discernible difference in explicitness and tone [that] unquestionably exists," with the result that "PLAYMEN seems likely to repel and shock many more." 486 F.Supp. at 432–32 & n.23.[6] Such equivocal evidence of the likelihood of confusion between PLAYBOY and PLAYMEN is insufficient to support an injunction against appellant's reference in its magazine cover entitled ADELINA to "America's Edition of Italy's Playmen" in a subtitle less than one-eighth the size of the ADELINA title. (See Apps. A & B).

Finally, the majority and the district court find further support for the general injunction in Scott's testimony that source confusion might well increase if the subtitle's use of "Playmen" became more prominent with increased size or repositioning. Nevertheless, the undisputed testimony is that, as currently employed, the subtitle engenders no product confusion and at most minimal source confusion. The proper course is to enjoin the subtitle use if and when the likelihood of confusion becomes appreciable, and not to anticipate what may never occur as long as ADELINA remains the dominant title. *Berlitz Schools of Language of America v. Everest House,* 619 F.2d 211, 215–16 (2d Cir. 1980).

Accordingly, I would reverse as clearly erroneous the general injunction against the use of "Playmen" in the subtitle or anywhere else on the cover, and also reverse the award of attorneys' fees.

**6.** The district court appears to fluctuate on this issue: to support its finding of irreparable harm warranting a preliminary injunction it found "discernible differences;" yet to support its later conclusion of product confusion justifying a permanent injunction it concluded that the difference "in terms of content, format and appearance ... were superficial." Compare 486 F.Supp. at 431–32 & n.23 with 511 F.Supp. at 488.

APPENDIX "A"

PLAYBOY

ENTERTAINMENT FOR MEN

AUGUST 1978 • $2.00

A WILD INTERVIEW
WITH SPORTSMAN
TED TURNER-
THE MOUTH
OF THE SOUTH

DO MEN NEED
TO CHEAT ON
THEIR WOMEN?
A NEW
SCIENCE SAYS YES

HOW THE BEE GEES
GOT TO BE SO BIG

CAN DALLAS REPEAT?
WILL DENVER FOLD?
PLAYBOY PREVIEWS
PRO FOOTBALL

BE FUNNY FOR
MONEY IN
OUR FIRST
HUMOR CONTEST

SECRETARIES
sexy pictures
of the girls
you wish you
worked with

APPENDIX "B"

# ADELINA

**AMERICA'S EDITION OF ITALY'S PLAYMEN**

VOL. XIV NO.2

FEBRUARY 1980
57816-2
$2.50
POC

## TERRORISM
IT CAN HAPPEN HERE!

EXCLUSIVE INTERVIEW
## MEL BROOKS
## SPEAKS OUT

FIRST PUBLICATION ANYWHERE
## PICASSO'S "FORBIDDEN"
## EROTIC DRAWINGS

HOW I BECAME A BRAND NAME
## By STEPHEN KING

## New Fiction By
## JOE HALDEMAN

## CLARK GABLE JR?

## IN THE NUDE
### FROM THE PLAYMEN ARCHIVES
GINA LOLLOBRIGIDA
SUSAN STRASBERG
CARROLL BAKER
ANNA BERGMAN
ANNE HEYWOOD