**TAVARO S.A. and White Consolidated Industries, Inc., Plaintiffs,**

v.

**Leon JOLSON, Nelco Sewing Machine Co., Inc., Nelco Corp. and Leon Trading Corporation, Defendants.**

No. 84 Civ. 2091–CSH.

United States District Court,
S.D. New York.

May 9, 1984.

Conboy, Hewitt, O'Brien & Boardman, New York City, for plaintiffs; Anthony L. Fletcher, New York City, of counsel.

Lieberman, Rudolph & Nowak, New York City, for defendants; Arthur Lieberman, New York City, of counsel.

### MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiffs bring this action for injunctive relief against defendants alleging trademark infringement, 15 U.S.C. § 1114(1), false designation of origin, 15 U.S.C. § 1125(a), unfair competition based on infringement of common law trademark rights, and violation of the New York Anti-Dilution statute, N.Y.Gen.Bus.L. § 368–d (McKinney 1969).

Plaintiff Tavaro S.A. is a Swiss corporation, and the designer, manufacturer and

distributor of ELNA sewing machines in Switzerland and throughout the world. ELNA brand sewing machines have been distributed in the United States since at least 1937. Tavaro owns U.S. Registration No. 785,555 of the trademark ELNA for sewing machines.

The plaintiff White Consolidated Industries, Inc. ("White") has since 1963 been Tavaro's exclusive United States distributor of ELNA sewing machines.

Defendant Leon Jolson, a United States citizen and resident, has at the pertinent times been a distributor of sewing machines in this country, and is the president of defendants Nelco Sewing Machine Co., Inc. and Leon Trading Corporation. Mr. Jolson has testified, and I find, that the fourth named defendant, "Nelco Corp.," does not exist.

I shall upon occasion refer to the defendants collectively as "Nelco."

Nelco is currently marketing in the United States a sewing machine known as the "Nelco Prima Vera." Plaintiffs are marketing in the United States a sewing machine known as the "Elna Primula." Both machines are manufactured in Japan by Hosei Sewing Machine Manufacturing Co., Ltd. ("Hosei"). The basic machines are identical, although there are cosmetic differences. The mechanical similarity of the machines does not give rise to plaintiffs' claims. Although Tavaro designed the original, basic machine, it has permitted Hosei to manufacture and sell the machine to Tavaro's competitors in the United States, such as Nelco.

Plaintiffs' complaints arise instead from Nelco's marketing techniques in respect of the sewing machines being manufactured for it by Hosei. Plaintiffs allege that Nelco's name "Prima Vera" infringes ELNA's name "Primula." In addition, plaintiffs contend that the use made by Jolson and Nelco of the "ELNA" name in advertising brochures and on labels affixed to the machines constitute trademark infringements and unfair competition. Finally, plaintiffs charge defendants with false advertising.

Plaintiffs now seek a preliminary injunction restraining defendants from:

"(1) Utilizing the trademark ELNA on or in connection with their sewing machines or advertising or publicity materials for such sewing machines;

"(2) Utilizing the model name 'Prima Vera' or any other colorable imitation of 'Primula' for any of their sewing machines; and

"(3) Falsely stating that their 'Prima Vera' model sewing machine (i) was inspired or designed in Switzerland, (ii) was engineered or designed by NELCO, (iii) was distributed by Elna in Switzerland, or (iv) in design, quality or appearance is exactly like a European-made machine; . . ."

Affidavits and briefs have been exchanged, an evidentiary hearing held, and certain testimony taken by deposition. Against that record, this opinion constitutes the court's findings of fact and conclusions of law.

I.

Defendant Leon Jolson arrived in the United States as a refugee from Poland in 1947. In Poland, the Jolson family business had been the importation and distribution of Italian-built sewing machines bearing the trade name "Necchi." Upon his arrival in the United States, Jolson raised some capital and began importing Necchi sewing machines into this country. The business prospered. In 1952, Jolson began importing ELNA sewing machines under a distribution agreement with Tavaro. Jolson's business became known as the "Necchi-Elna Sewing Machine Company." The business did well because these sewing machines had "zig-zag" features which were advanced for the time.

In 1963 Tavaro terminated its distributorship agreement with Jolson and the latter's companies. It is unnecessary to recite the asserted reasons for this parting of the ways. But the parting was not amicable; and Jolson (then operating under the corporate name "J. & K. Importing Corporation") initiated arbitration proceedings

against Tavaro before the International Chamber of Commerce in Paris.

The arbitrators ruled initially in Jolson's favor. Tavaro noted an appeal. Ultimately the proceedings were withdrawn and a settlement agreement entered into. It was reduced to writing. The written settlement agreement dated at Geneva on October 2, 1964 is in evidence as PX 3. It was negotiated by Jolson and the then managing director of Tavaro, one Mr. Anliker, now deceased. The settlement agreement recites the resolution of various claims and counterclaims which are not germane to the present motion. But ¶ 6 is pertinent. It reads:

"6. Tavaro S.A. will withdraw its opposition against the trade-mark NELCO and accept that NELCO Sewing Machine Co. Inc. continues to use its firm and trade-mark NELCO, provided NELCO Sewing Machine Co. Inc. writes a letter, of which Tavaro S.A. will receive a copy, to all its distributors and dealers informing them:

"a) that Tavaro S.A. and ELNA have no connection whatsoever with NELCO Sewing Machine Co. Inc. and NELCO and JOLSON machines, and

"b) that the distributors and dealers selling NELCO and/or JOLSON machines are therefore not entitled to use, in any manner whatsoever, the word 'ELNA', and/or the words 'NECCHI–ELNA', and/or the monogram '$\frac{N}{E}$', and/or the logo 'NECCHI–ELNA Sewing Circle', and/or the logo 'NECCHI–ELNA–NELCO–JOLSON Sewing Circle', in connection with the sale of such machines.

"*J. & K. Importing Corporation and its affiliated companies and/or persons will not, without Tavaro S.A.'s written consent, and with the sole exception of the word and trade-mark NELCO, make any use whatsoever of the name ELNA or other similar names or any symbol derived therefrom and/or the symbol $\frac{N}{E}$.*" (emphasis added).

The written settlement agreement was not introduced during plaintiffs' case or Jolson's direct examination by defendants' counsel. In that direct testimony, Jolson said that after the arbitration proceedings had been terminated, he met with Anliker in Geneva and Anliker agreed, within the context of an overall settlement, that Jolson was entitled to "use our association to start a new business again in the future." Tr. 58. That is to say (according to Jolson's direct testimony): Anliker gave his blessing to Jolson's continued use of the name "ELNA" for the purpose of Jolson's description of his experience in the sewing machine field, although he was no longer an ELNA distributor.

On cross-examination, counsel for plaintiffs confronted Jolson with the written settlement agreement. Jolson acknowledged the agreement, but said that he signed it out of sympathy with Anliker's physical condition, and that at a subsequent date Anliker gave Jolson permission, at least implicitly, to continue to "refer to my past as a Necchi-ELNA distributor." Jolson's testimony as it was developed on cross-examination is set out in the margin.[1] Tr. 81–82.

---

1. Q. Mr. Jolson, I show you that document and ask if it refreshes your recollection.
A. This does refresh my recollection.
Q. And what is your recollection as refreshed?
A. My recollection is refreshed that we have been in such haggling of the litigation and all the points of settlement, and I am sorry that I have to mention it, I wanted to settle it very, very much because Mr. Anliker was not only a supplier of mine, he was a friend before this has happened. And during the litigation he took sick and an ambulance had to take him back. He was all disappointed of losing the case, that I was anxious, whatever they have written, I signed and I wanted to—but after this, the same time, we became again friends and we forgot—we started to talk again about our wives who used to be very friendly. We used to come to each other's house. And I told him, "Listen, I'm starting out a new business. I have to have ways and means to come back. My capitals are not big. My past as Necchi Elna distributor I am not going to eradicate. I will do everything what we can to preserve, the Elna name is yours, but I am going to refer to my past as a Necchi Elna distributor." And he had not objected. He has seen me several times after this, we talked, he asked me if I am making a profit,

I cannot accept that account as credible. Tavaro, in its precise Swiss fashion, had agreements and even company letters signed by not one but two corporate officers. Thus the settlement agreement, PX 3, contains a second signature on behalf of the company beside that of Anliker. Tavaro's practice of double signatures on business letters is acknowledged in the testimony of Jolson himself. In the settlement agreement, Tavaro went to the effort of providing that Jolson and his companies would not "without Tavaro S.A.'s written consent and with the sole exception of the word and trade-mark NELCO, make any use whatsoever of the name ELNA...." Having insisted upon so specific a prohibition, and having provided further that consent to nonconforming use must be in writing, it is unlikely in the extreme that shortly thereafter, Anliker would violate his company's practice (not to mention the specific terms of the document in question) by agreeing to an oral modification on a clearly sensitive issue.

It is common ground that Tavaro has never given written consent to any use of the name ELNA or its derivatives apart from that specified in ¶ 6 of the settlement agreement. But defendants contend that corroboration of the alleged oral modification of the settlement agreement is found in Tavaro's acquiescence in Jolson's conduct subsequent to 1964. Because that conduct lies at the heart of the case, I will consider it in some detail.

Jolson was justifiably proud of his success as the American distributor for Necchi and Elna sewing machines. Indeed, that success had been the subject of a number of laudatory articles in the financial and trade press. In 1963, those distributorships were lost to Jolson (Necchi had also terminated its relationship with him). But Jolson wished the sewing machine world to continue to be aware of the relationship.

Jolson and his corporations continued to distribute and market sewing machines under the trade name "Nelco." As the 1964 settlement agreement with Elna makes en-

tirely clear, that trade name was derived from a combination of "Necchi" and "Elna." Continuing use of the name "Nelco" was the one liberty permitted Jolson by paragraph 6 of the settlement agreement in respect of Elna derivatives.

Subsequent to 1963, Jolson followed a practice of identifying himself as a former distributor of Necchi and Elna machines. He did this by affixing labels to Nelco machines; by including material in printed "hang tags" which were tied on to Nelco machines; and by referring to the former relationship in printed advertising matter.

Examples of labels utilized by Jolson and Nelco over the years are reproduced as Appendix A to this opinion. An example of the biographical material appearing on hang tags appears as Appendix B. This printed material serves to identify Jolson as the man who introduced the Necchi and Elna machines to the American public, and acted as their distributor from 1948 to 1963.

Curt Arvidson, the president of White Sewing Machine Company, testified by deposition. White Sewing Machine Company is a division of plaintiff White Consolidated Industries, Inc. Arvidson's division is responsible for the sales and distribution of White and Elna sewing machines in the United States. Under date of April 25, 1980, Arvidson sent Jolson a letter protesting Jolson's references to Elna in advertising brochures. That letter, PX 1, reads in part:

"The statement on the reverse side of your spec sheet mentions that you were a distributor of Elna from 1948 to 1963, which I do not contest, however, I don't think it is in good, competitive spirit. I would appreciate it if you could delete the Elna brand name from your literature."

Arvidson testified that, following receipt of that letter, Jolson telephoned him and promised that he would not use the Elna brand name in his literature after he ran out of the literature that he already had.

how I am making out in my new venture,                    ventures.

Dep. Tr. 5. Jolson does not dispute that in his testimony; but it is clear from the record that he continued to refer in labels and brochures to his prior distributorship relationship with Elna. There is no evidence that White or Tavaro followed up on the April 1980 protest until the events which precipitated this litigation and are discussed *infra.*

Arvidson testified that prior to April 1980, he had not been aware of the references Jolson made in labels and advertising material to the prior Elna relationship. I cannot credit that testimony, in view of the repeated references Jolson made in such material throughout the years, and the keen interest with which competitors examine each other's products and published materials at trade shows and in trade publications. For the same reasons, it is likely that executives at White were aware of Jolson's continued references to his Elna relationship subsequent to April 1980.

The seeds of the present litigation were sown when in the spring of 1982, White introduced in the United States market a sewing machine called the "Elna Primula 410." Its ancestor, a machine called "Model 505," had been manufactured in or about 1977 by Hosei. The original Model 505 was a co-operative engineering effort between White and Hosei. Thereafter White made modifications to the 505, and with the approval and cooperation of Tavaro introduced that modified version as the "Elna Contessa" in October of 1979. White decided against marketing the Hosei/White 505 in mid-1980; but Tavaro took up the re-design of the machine, made additional changes, and eventually introduced two further versions of the machine—the Primula 410 and 450—in Europe, South Africa, Australia and New Zealand. As noted, White introduced the Elna Primula 410 in the United States in the spring of 1982.

Meanwhile, Hosei further modified the Model 505, in consultation with Jolson, and has sold it to the Nelco interests for distribution in the United States. Before selling a progeny of its original 505 model to a competitor of Tavaro, Hosei sought and obtained from Tavaro a statement that Tavaro had no objection. Jolson is now introducing in this country a machine derived from this model, called the "Nelco Prima Vera Model 100F."

Plaintiffs commenced this litigation soon after that marketing effort on behalf of Nelco got under way.

Mechanically, the two models are virtually identical, both being descendants of the original Hosei/White Model 505. Plaintiffs cannot complain of that, since, as noted, Tavaro did not oppose Hosei's sale of the machines to competitors such as Nelco. The differences are cosmetic; and what plaintiffs complain of, in essence, is the trade dress and Nelco's marketing techniques.

Specifically, Nelco has attached to its Prima Vera Model 100F sewing machines a label in the form which appears as Appendix C. Nelco's advertising flyer for the machine is reproduced as Appendix D. Nelco has sent distributors an information sheet, a copy of which appears as Appendix E.

Whether these labelling and marketing techniques are infringing or constitute unfair competition will be considered *infra.* It is sufficient for present purposes to say that, within the context of the "Nelco Prima Vera" model, Nelco's references to the prior Elna relationship underwent a sea change. The label now affixed to the Nelco Prima Vera, and reproduced in its advertising flyers, for the first time prints the names "Necchi & Elna" in letters more than twice as large as the name "Leon Jolson." And the phrase delineating the term of the prior distributorship—"from 1948 to 1963," is printed in such a way as to blur the distinction between the "8" in 1948 and the "6" in 1963.

When one looks at the new label, the eye is first caught by the phrase "Necchi & Elna," the profile of a sewing machine, and the word "Nelco," in the same type and size as "Necchi & Elna." The name "Leon Jolson" retreats, by virtue of its significant reduction in size, into relative obscurity; and the phrase "distributor of," which

comes after "Leon Jolson" and before "Necchi & Elna," is very small indeed.

Plaintiff's prompt protest of these marketing techniques is entirely consistent with the affidavit and testimony of Arvidson: that such oral consent was never given to Jolson, but that until the Nelco Prima Vera campaign began, Jolson's references to the Elna connection, while wrongful in plaintiff's view, did not seem worth legal action.

In short, I find that the written prohibitions placed on defendant's use of the trade name Elna in the written settlement agreement of October 2, 1964 were not purportedly modified by subsequent conversations between Jolson and Anliker. The proposition is inherently unlikely; defendants can produce no note or memorandum evidencing so significant an alteration of the original, written agreement; and plaintiffs' post-1964 conduct is not fatally inconsistent with their contention that no such modification ever took place.

Because I reject defendants' evidence on the existence of the purported modification, I need not reach those issues of legal sufficiency—implicating failure of consideration and the statute of frauds—which would arise if I had concluded that the alleged conversation took place.

## II.

Having said this much, it follows that plaintiff is legally entitled to insist that defendants stop using the trademark ELNA "on or in connection with their sewing machines or advertising or publicity materials for such sewing machines." I have quoted from the first paragraph of the prayer for relief by way of preliminary injunction. Plaintiff Tavaro is the beneficiary of a contract which prohibits Jolson and his defendants from making "any use whatsoever of the name ELNA or other similar names or any symbol derived therefrom" without Tavaro's written permission, with the sole exception of the trade name NELCO. Defendants are subject to that contractual prohibition.

Defendants seek refuge in the general rule that trademarks of a rival company can be used in competitive advertising, so long as that advertising does not contain misrepresentations or create a reasonable likelihood of purchaser confusion as to source, identity or sponsorship. *Cuisinarts, Inc. v. Robot-Coupe International Corp.*, 509 F.Supp. 1036, 1042 (S.D.N.Y. 1981). But that rule is not inconsistent with a party's freedom to contract away its future right to such use, as part of the resolution of commercial disputes. That is what defendants did in this case. Plaintiff Tavaro is entitled to enforce that provision of the contract.

Plaintiffs' present motion is one for preliminary injunction. On this aspect of the case, however, I have before me all the evidence that is likely to be adduced. Jolson has testified; Anliker is deceased; I have examined the pertinent documents, and considered the absence of other documents; I have considered the course of conduct of the parties. In consequence, the criteria which determine a plaintiff's entitlement to a preliminary injunction, see, e.g., *Mattel, Inc. v. Azrak-Hamway International, Inc.*, 724 F.2d 357, 359 (2d Cir. 1983), as a practical matter do not apply. Since plaintiff's demands for relief are entirely equitable, no right to trial by jury is implicated. In these circumstances, unless defendants can suggest plausible additional sources of pertinent evidence, I will enter a permanent injunction restraining defendants, their agents, servants, officers and privies, from utilizing the trademark ELNA on their sewing machines, or in written advertising or publicity materials for such sewing machines. I phrase the restraint in these terms because I would not be inclined to forbid Mr. Jolson from telling people orally that he used to be an Elna distributor. Nor do I understand plaintiffs to press their claim for injunctive relief that far. Defendants may suggest the existence of any additional evidence in a response to the order to be settled by plaintiffs.

## III.

Plaintiffs' next demand is that defendants be restrained *pendente lite* from "utilizing the model name 'Prima Vera' or any other colorable imitation of 'Primula' for any of their sewing machines."

The standard in this circuit for injunctive relief requires a showing of, first, irreparable harm; and, second, "either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Mattel, Inc. v. Azrak-Hamway International, Inc., supra.* In a trademark infringement case, "a substantial likelihood of confusion constitutes, in and of itself, irreparable injury sufficient to satisfy the requirements of Rule 65(b)(1)." *Matter of Vuitton et Fils S.A.*, 606 F.2d 1, 4 (2d Cir.1979). That element of confusion, central to all cases of alleged trademark infringement and unfair competition, has been defined as the "likelihood that an appreciable number of ordinary prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Mushroom Makers Inc. v. R.L. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979).

In the case at bar, I conclude that a sufficient likelihood of purchaser confusion exists to demonstrate the concomitant likelihood that plaintiffs will prevail on the merits. Because the models, both crafted by Hosei, are essentially the same, their profiles and arrangement of the more significant moving parts are identical. Plaintiff Tavaro cannot complain of that, not having sought to impose any restrictions upon Hosei as to whom the latter could sell to. However, given the very close basic similarity of the machines, Nelco was under an added obligation to refrain, in its trade dress, labels and advertising, from creating the possibility of consumer confusion as to source.

It is in these respects that the Nelco Prima Vera machine infringes upon the Elna Primula machine, and subjects the latter to unfair competition. It is true that plaintiffs' machine displays the word "Elna" in large letters on the left-hand side, directly beneath the lower of two control wheels, whereas defendants' machine displays the word "Nelco" in that position. However, defendants' revised label, to which prior reference has been made, is affixed in close proximity to the word "Nelco," at the base of the machine. If one looks only at the left side of the machine, only the word "Nelco" is visible. But if one views the machine from that position which, if the machine were a vessel, we would call the port quarter, the word "Nelco" is in relatively close proximity to the phrase "Necchi & Elna," the latter two words having been so increased in size as to case the name "Leon Jolson" distinctly into the shade. As a customer views the Nelco Prima Vera from various angles (as seems likely enough), a distinct potential for a mistaken impression that Elna has something to do with the machine emerges.

The Elna machine also contains the phrase "Primula 410" on its left side, to the left of the top control wheel. The lettering and numbers are relatively large, although smaller than the word "Elna." On the Nelco machine, the words "Prima Vera" appear in approximately the same place, although in significantly smaller lettering than the phrase "Primula 410." However, in the advertising flyers promoting these machines, the phrases "Elna Primula 410" and "Nelco Prima Vera" appear in the same relative positions on the flyers, and in lettering of comparable size. The Nelco flyer is Appendix D to this opinion. The Elna flyer is Appendix F.

In those circumstances, the readily apparent similarity between "Prima Vera" and "Primula" gives rise to another potential source of confusion. Both words begin with the prefix "Prim" and end with the letter "a." Both words evoke a particular season of the year. "Prima Vera" is Italian for "spring." "Primula" is a synonym for "primrose," and is derived from Medie-

val Latin, *"primula veris,"* literally, "firstling of spring." Webster's New Collegiate Dictionary (1976) at 914. I do not suggest that every "ordinary prudent purchaser" has a working knowledge of Medieval Latin; but "Prima Vera" and "Primula" both suggestively elicit the same pleasant time of year. In short, seeking a name for a machine identical to plaintiffs', and with the whole wide world of words and names to choose from, defendants came as close as they could to the name chosen by plaintiffs. Cf. *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 687 F.2d 563, 567 (2d Cir.1982) ("Simply stated, the title 'Playmen' comes as close as one could to the 'Playboy' title."). In *Playboy Enterprises,* the Second Circuit quoted *American Home Products Corp. v. Johnson Chemical Co.*, 589 F.2d 103, 107 (2d Cir. 1978) for the proposition that "[o]ne who adopts the mark of another for similar goods acts at his own peril and any doubt concerning the similarity of the mark must be resolved against him." That principle applies here.

■ Having demonstrated the likelihood of success on the decisive issue of consumer confusion as to source, the requisite showing of irreparable injury follows, and plaintiffs are entitled to the preliminary injunction prayed for.

Plaintiffs' final complaint is that defendants' advertising falsely states that their Prima Vera model sewing machine (1) was inspired or designed in Switzerland; (2) was engineered or designed by NELCO; (3) was distributed by Elna in Switzerland; and (4) in design, quality or appearance is exactly like a European-made machine.

■ All these statements appear in various printed distributions generated by defendants. I am persuaded by the evidence in the case that they are false. Accordingly their reiteration will also be enjoined.

## CONCLUSION

For the foregoing reasons, plaintiffs are entitled to the equitable relief prayed for.

Plaintiffs' counsel are directed to settle a judgment and order, in conformity with this opinion, on notice.

It is SO ORDERED.

APPENDIX A

## APPENDIX B

JOLSON is the family name of the man who introduced the NECCHI and ELNA to American public.

When you discover for yourself the ease of operation, the flawless performance and the limitless sewing jobs this machine will do for you, you will understand why Mr. Jolson has created this new master-piece of technological achievement and recommends this new NELCO sewing machine to you. With your choice of a NELCO sewing machine, you have chosen the best . . . a machine that does not compromise quality for a price . . . a machine that will serve you for a lifetime.

## APPENDIX C

LEON JOLSON
distributor of

NECCHI & ELNA
from 1948 to 1963

Precision made in Japan

Engineered

Designed

APPENDIX D

## APPENDIX E

## NELCO INTRODUCES THE NEW PRIMA VERA MODEL

by Leon Jolson

Some dealers think that if they pay a higher price for a European sewing machine they get a better quality. This is definitely not so. A lot of European models which are high priced are not better in performance, precision and finishing versus the moderately priced machines made in Japan, especially if they come from a factory where experienced technicians observe the finished product on the assembly line. The lower price of a Japanese-made machine does not mean that it is of poor quality, but comes from a completely different industrial concept. The reason is that the parts are massed produced by individual parts makers. You can believe me, as in my lifetime I have work and been affiliated with sewing machine manufacturers in Germany, Switzerland, Italy and Japan. I have personally experienced what I state here.

NELCO is always innovative. We are now introducing a new model—the NELCO prima vera 100F. This was distributed by the Elna Company in Switzerland and manufactured in a highly efficient factory in Japan. For this reason, the quality, design and beautiful appearance of it is exactly like a European-made machine. It has 20 built-in stitches, plus a buttonhole, 3-needle position and separate cams for sewing straight and zigzag stitches. The straight stitch is completely perfect because it is like a specially built straight stitch machine. With all of these features, our model 100F is moderately priced. A color leaflet is enclosed with this issue of the Round Bobbin giving all the details.

If you really want to sell an excellent machine, make a good profit and build a following for your future business, order a sample from us and convince yourself. Should you decide that it is not the best buy on the market as far as quality, performance and price are concerned, you may return it to us for credit. CALL NELCO SEWING MACHINE CO., INC., 164 West 25th Street, New York, N.Y. 10001 on our toll free number—800–221–828–; in New York State Call Collect 212–924–7604.

APPENDIX F

PRIMULA 410

Inspired by Elna. Supervised by Elna. Guaranteed by Elna. Manufactured in Japan exclusively for Elna.
**With 10 automatic stitches and automatic buttonhole.**