### LES BALLETS TROCKADERO DE MONTE CARLO, INC., a New York Corporation, Plaintiff,

v.

Victor TREVINO, Les Ballets Torokka de Russia (a.k.a. Les Ballet Trocka de Russia), Gregory Wolverton, Jem Jender (a.k.a. James O'Connor–Taylor), Jeffrey Aney Virgil Angulo, Daniel Buskirk, Roland Culler, Alfredo Milan, Sven Toorvald, Ivan Torres, Brian Joe, Samuel Curcio, Michael Lineberry, Kelby Brown, International Promotion for Music, Inc. (d/b/a "IPM"), a New York Corporation, John Does 1–10, and XYZ Corporation, Defendants.

No. 96 Civ. 6647 (JGK).

United States District Court, S.D. New York.

Oct. 28, 1996.

Peter L. Skolnik, Edward M. Zimmerman, Mauricio Paez, Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, NJ, for Plaintiff.

Brian Doherty, McGovern & Associates, New York City, for Defendants.

## OPINION AND ORDER

KOELTL, District Judge:

The plaintiff "Les Ballets Trockadero de Monte Carlo, Inc." is an all male satirical ballet troupe. It seeks a preliminary injunction enjoining the defendants from directly or indirectly using the name "Les Ballets Torokka de Russia," or the words "Trocks," "Trock," "Trockettes," "Trockadero," "Torokka," "Torokkadero," or "Trocadero" (or similar variations of any such word) in conjunction with the words "Ballet," "Ballets," or any other words identifying a dance company or dance troupe, or using any other mark, words, or names confusingly similar to the plaintiff's, including the use thereof in any advertising or promotional material, whether printed, verbal, broadcast, electronically or otherwise. The plaintiff alleges that the defendants have been unlawfully infringing its registered service marks and promoting their dance troupe in a way that is confusingly similar to the plaintiff's, all in violation of the Lanham Act. The plaintiff argues that the defendants are likely to continue their infringing activities unless enjoined and that the plaintiff will be irreparably injured.

For the reasons stated below, the motion for a preliminary injunction is granted.

## I.

After reviewing the parties' submissions including the affidavits submitted by both sides, the Court held a hearing and heard oral argument. The Court now makes the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

The plaintiff, Les Ballets Trockadero de Monte Carlo, Inc. (the "Trocks"), is an all male satirical ballet troupe founded in 1974 in New York as a not-for-profit corporation. The Trocks have performed for more than twenty years in the United States and abroad. The plaintiff has obtained federal service mark protection from the United States Patent and Trademark Office for the names "Les Ballets Trockadero de Monte Carlo," "Trocks," and "Trockadero." (Skolnik Decl.Ex. U.) Japan represents the Trocks' largest market from which it derives approximately eighty percent of its annual revenues. (Amended Verified Complaint "Am.V.Compl." ¶ 28.) The Trocks stage approximately forty performances every summer in Japan. For many years, ZAK Corporation, a Japanese company owned and operated by Kyoichi Miyazaki ("Zak"), has produced the Trocks' tours in Japan. (Am. V.Compl. ¶ 29.) In return for payments of approximately $660,000 per year, Zak has the exclusive right to promote the Trocks in Japan, and the Trocks can only perform in Japan through engagements obtained for it by Zak. Zak also established and derives income from the Trocks' official Japanese fan club, Club Trockadero, which has over one thousand members. On January 25, 1994, ZAK Corporation filed an application in Japan to register the mark "Trockadero de Monte Carlo Ballets Dan." (Matsuo Decl. ¶ 11; Miyazaki Decl. ¶ 28.)

In May, 1995, Zak formed defendant International Promotion for Music ("IPM") as a New York corporation with Zak as the President, sole director, and sole shareholder. (Skolnik Decl.Ex. S at DE1–9; Saito Dep. (Skolnick Decl.Ex. B) at 12; Miyazaki Decl. ¶ 1.) According to Suguru Saito, the Vice President of IPM, Zak established IPM in order to extend his business operations and to create a New York presence. (Saito Dep. (Skolnik Decl.Ex. B) at 12, 14.) In late 1995, IPM retained defendant Victor Trevino, a former Trocks ballet dancer, to help organize an all male satirical ballet company that would compete with the Trocks and to be IPM's artistic director for all its ventures. (Trevino Dep. (Skolnik Decl.Ex. A) at 11–13, 18–20; Saito Dep. (Skolnik Decl.Ex. B) at 15–16.) Trevino recruited the individual defendant dancers, negotiated their contracts,

organized music for the performances, retained a photographer, ordered the costumes and sets, and selected the ballets to be performed. (Trevino Dep. (Skolnik Decl.Ex. A) at 20–21.) During early 1996, Zak, Trevino, and Saito considered names for the new ballet company and ultimately selected Les Ballets Torokka de Russia (the "Torokka"). (Skolnik Decl.Ex. P at L21–23, L29, L34–37; Trevino Dep. (Skolnik Decl.Ex. A) at 84–85, 92, 94–96; Saito Dep. (Skolnik Decl.Ex. B) at 117–119.) According to Zak, IPM is the sole owner of defendant Torokka, which was created in order to provide an additional source of income through the scheduling of a winter tour. (Miyazaki Decl. ¶¶ 17, 21.) Although the defendants contend that in April, 1996, Zak applied to register the mark "Les Ballet Torokka de Russia" in Japan, (Miyazaki Decl. ¶ 23), the plaintiff maintains that Zak instead applied for the mark "Torokkadero Sia Ballets Dan" or Torokkadero (Trockadero) Theater Ballet Company. (Matsuo Decl. ¶ 14; Mizenko Decl. ¶¶ 3–4.)

The defendants made plans for a Torokka winter 1996–1997 tour in Japan. (Am. V.Compl. ¶ 34a.) During the Trocks' Japanese tour in July and August 1996, flyers were distributed at the Trocks' performances and inserts were placed in the Trocks' programs that promoted the defendants' planned tour as a "Trockadero Winter Version" and "Trockadero's Winter Company." (Skolnick Decl.Ex. Q at DJ2–3, DJ98; Miyazaki Decl. ¶ 26.) In letters to the Trocks during that period, Zak disclaimed responsibility for these actions and informed the Trocks that he was having trouble obtaining bookings for them in 1997. (Am. V.Compl.Ex. G, H.) On August 19, 1996, the plaintiff's counsel sent the defendants a cease and desist letter, (Am.V.Compl.Ex. I; McDougle Decl. ¶ 6), and on August 30, 1996, the plaintiff commenced this action.

## II.

To prevail on a motion for a preliminary injunction, the party requesting relief must show: "(1) the likelihood of irreparable injury, and (2) either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in the movant's favor." *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 967 (2d Cir.1995); *see also Fisher–Price, Inc. v. Well–Made Toy Mfg. Corp.*, 25 F.3d 119, 122 (2d Cir.1994); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979). For the reasons stated below, the Court finds that the plaintiff has shown a likelihood of success on the merits, irreparable harm, and that the balance of the hardships tips decidedly in its favor.

## III.

### A.

As a threshold issue, the defendants argue that this action should be dismissed because the proceeding should take place in Japan under Japanese law. However, "Congress in prescribing standards of conduct for American citizens may project the impact of its laws beyond the territorial boundaries of the United States." *Steele v. Bulova Watch Co.*, 344 U.S. 280, 282, 73 S.Ct. 252, 254, 97 L.Ed. 319 (1952). The Lanham Act may be applied to activities outside the United States. *See id.* at 285–87, 73 S.Ct. at 255–56 (applying the Lanham Act to conduct in Mexico). In *Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633, 633, 641–42 (2d Cir.), *cert. denied*, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956), the Court of Appeals for the Second Circuit articulated the factors to be considered in determining the extraterritorial application of the Lanham Act: (1) whether the defendant's conduct has a substantial effect on United States commerce; (2) whether the defendant is a United States citizen; and (3) whether there is no conflict with trademark rights established under foreign law. *See id.* at 642. "None of these three criteria is dispositive of the analysis concerning the Lanham Act's extraterritorial effect, and a court must employ a balancing test of all three factors to determine whether the statute is properly implicated." *Warnaco Inc. v. VF Corp.*, 844 F.Supp. 940, 950 (S.D.N.Y.1994). However, the Court of Appeals also instructed that the absence of one of the factors may be fatal, and the absence of two factors was fatal in the *Vanity Fair* case. *See Vanity Fair*, 234 F.2d at 643.

As to the first factor, the plaintiff has demonstrated that the defendants' conduct has a substantial effect on United States commerce. A substantial effect on United States commerce may arise from a defendant's activities that are supported by or related to conduct in United States commerce, *see Calvin Klein Indus., Inc. v. BFK Hong Kong, Ltd.*, 714 F.Supp. 78, 80 (S.D.N.Y.1989); harm to a plaintiff's reputation, *see King v. Allied Vision, Ltd.*, 807 F.Supp. 300, 307 (S.D.N.Y.), *aff'd in part and rev'd in part on other grounds*, 976 F.2d 824 (2d Cir.1992); diversion of sales, *see American Rice, Inc. v. Arkansas Rice Growers Coop. Ass'n*, 701 F.2d 408, 414–15 (5th Cir. 1983); or adverse impact on foreign licensees, *see Playboy Enters. v. Chuckleberry Publishing, Inc.*, 511 F.Supp. 486, 495 (S.D.N.Y.1981), *aff'd*, 687 F.2d 563 (1982); *see also Warnaco*, 844 F.Supp. at 951–52 (reviewing the various grounds for determining that conduct has a substantial effect on United States commerce).

The defendants have engaged in conduct in the United States designed to further their infringing activities: Zak has formed defendant IPM, a New York corporation, in order to extend his business operations, to create a New York presence, and to organize the Torokka in the United States, and those activities have been assisted by the individual defendants, (Skolnik Decl.Ex. S at DE 1–19; Saito Dep. (Skolnik Decl.Ex. B) at 14; Miyazaki Decl. ¶ 17); defendant Trevino used "Les Ballet Torokka de Russia" letterhead to correspond with dancers across the United States, (Trevino Dep. (Skolnik Decl.Ex. A) at 63); and defendant Trevino recruited the defendant dancers, negotiated their contracts, organized music for the performances, retained a photographer, ordered the costumes and sets, selected the ballets to be performed, and reserved rehearsal space in the United States, (Trevino Dep. (Skolnik Decl.Ex. A) at 21–22, 82–83).

Moreover, as a result of the defendants' infringing activities, the effects on United States commerce include dilution and damage to the plaintiff's U.S. registered marks and reputation, as well as damage to the Trocks' prospective business and licensing negotiations in a market from which it derives eighty percent of its income. *See Philip Morris Inc. v. MidWest Tobacco, Inc.*, CIV.A. No. 88–1292–A, 1988 WL 150693, at *3 (E.D.Va. Nov. 4, 1988).

The second *Vanity Fair* factor, the existence of an American defendant, is also satisfied. The individual defendants are all citizens of the United States, and defendant IPM is incorporated in New York state.

The third *Vanity Fair* factor, no conflict with the trademark rights under foreign law, also supports the exercise of extraterritorial application of the Lanham Act in this case. Protecting the plaintiff's rights in its marks by preventing the defendants from infringing those rights by using confusingly similar marks in Japan would not conflict with Japanese law. The plaintiff has persuasively demonstrated the likelihood that, under Japanese law, the defendants, as well as Zak and ZAK Corporation, do not have protectable rights under Japanese law to any of the marks at issue in this case.

The plaintiff's expert on Japanese trademark law, Kazuko Matsuo, explains without contradiction that, under Japanese trademark law, registration of marks provides protection. But before registration is granted and recorded in the Patent Office in Japan, an applicant has no legal rights in the mark other than rights it may have in an unregistered mark, and none are created by filing an application. (Matsuo Decl. ¶ 9.) Although Zak and/or ZAK Corporation has filed applications for the registration of various marks in Japan, those applications are being contested, and it is undisputed that neither Zak nor ZAK Corporation holds a registration on any of the marks at issue in this case. Indeed, the plaintiff has persuasively shown that it is likely to be able to prevent Zak and/or ZAK Corporation from obtaining a valid registration on any of the marks at issue because the plaintiff's mark is a well-known mark in Japan and, under Japanese law, would take precedence over any application filed by Zak or ZAK Corporation for similar marks. Mr. Matsuo explains that unregistered trademarks and service marks are protected under Japanese Unfair Competition Prevention Law where there is proof of

(1) the well-known nature of the mark; (2) the similarity of the defendant's mark; and (3) the likelihood of confusion. (Matsuo Decl. ¶ 7.) The owner of a well-known mark can institute invalidation proceedings against the owner of a registered mark if it can demonstrate that it was the first to use and continue to use the mark. Although Japan has adopted the "first to file" rule for competing applications, a party cannot successfully register its mark if it is similar to another party's registered mark or well-known unregistered mark. (Matsuo Decl. ¶ 9.)

The plaintiff's uncontradicted evidence supports the conclusion that the plaintiff's marks are well known in Japan and therefore that ZAK Corporation holds no protectable rights in any relevant marks.[1] Mr. Matsuo testifies that, based on his review of performances, promotional materials, and newspaper and magazine articles, the plaintiff's marks "Les Ballets Trockadero de Monte Carlo," "Trockadero," and "Trocks" have become so well-known in Japan that the plaintiff is entitled to protection under Japanese Unfair Competition Prevention Law and can prevent others from using confusingly similar marks. (Matsuo Decl. ¶ 8; Matsuo Reply Decl. ¶¶ 1–2.) His testimony is also supported by evidence that the Trocks' largest following is in Japan, (Am.V.Compl. ¶ 28 & Ex. B at 2), that it derives approximately eighty percent of its annual revenues from its Japanese tours, (Am.V.Compl. ¶ 28), and that its fan club in Japan, Club Trockadero, has over a thousand members.

Although ZAK Corporation filed a service mark application for "Trockadero de Monte Carlo Ballet Dan" on January 25, 1994, Mr. Matsuo states that his firm has filed an opposition to registration for that mark, as well as Petitions for Providing Information with the Patent Office in order to prevent

ZAK Corporation's applications for the marks "Trocks" and "Trockadero de Monte Carlo Ballet Dan" from being registered. (Matsuo Decl. ¶ 12.) Although Zak asserts that in April, 1996, ZAK Corporation applied for a trademark of "Les Ballet Torokka de Russia," (Miyazaki Decl. ¶ 23), Mr. Matsuo explains that ZAK Corporation instead applied for the mark "Torokkadero Sia Ballets Dan" in order to suggest some connection with the plaintiff and its marks. (Matsuo Decl. ¶ 14.) In Mr. Matsuo's opinion, ZAK Corporation's applications for registration of these or other similar marks will be denied because the plaintiff's marks are well-known in Japan. (Matsuo Decl. ¶ 15.)

An injunction in this case will not conflict with rights granted under Japanese law.

Accordingly, each of the three *Vanity Fair* factors supports the exercise of extraterritorial application of the Lanham Act in this case.

### B.

The plaintiff seeks a preliminary injunction pursuant to its claims for trademark infringement under Section 32(1) and Section 43(a)(1) of the Lanham Act. Section 32(1) provides protection against the "reproduction, counterfeit, copy, or colorable imitation of a registered mark" where "such use is likely to cause confusion, or to cause mistake, or to deceive . . . ." 15 U.S.C. § 1114(1)(a). Section 43(a) protects both registered and unregistered marks against the use of any symbol or mark that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by

---

1. Although the defendants assert that Mr. Matsuo's statement that the mark "Les Ballet Trocadero de Monte Carlo" is well-known in Japan is conclusory and unsubstantiated by any evidence, the defendants' assertion is contradicted by their own evidence. In a declaration submitted by the defendants, Zak admits:

> The term "Torokadero" (or variations thereof) is absolutely crucial to marketing an all male satirical ballet tour in Japan. Based on my experience as a promoter (and as evidenced by

the failure of the tour of the "New Boys", the only other all male ballet group to tour Japan of which I am aware), such a descriptive term is crucial to properly promoting an event in general, and in particular, an event with a new group. In other words, without the term "Torokadero" in the name, many fans of all male satirical ballet will not even realize that [Torokka] is an all male satirical ballet group. (Miyazaki Decl. ¶ 25 (footnote omitted).)

another person...." 15 U.S.C. § 1125(a)(1)(A).

To show a likelihood of success on a claim for trademark infringement under Sections 32(1) and 43(a) of the Lanham Act, a plaintiff must, as a preliminary matter, show that the mark in question is entitled to protection. *See Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 960 (2d Cir.1996); *Russian Kurier, Inc. v. Russian Am. Kurier, Inc.*, 899 F.Supp. 1204, 1208 (S.D.N.Y.1995). According to Section 7(b) of the Lanham Act, a certificate of registration of a trade or service mark issued by the United States Patent and Trademark Office is "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate...." 15 U.S.C. § 1057(b). The plaintiff has obtained federal service mark protection for the names "Les Ballets Trockadero de Monte Carlo," "Trockadero," and "Trocks." (Am.V.Compl. ¶¶ 25–26 & Ex. A.)

■ However, the defendants argue that the name "Trockadero" and its variations are generic terms that describe a type of product—an all male satirical ballet group—and therefore are not entitled to trademark protection. *See King–Seeley Thermos Co. v. Aladdin Indus., Inc.*, 321 F.2d 577, 578–81 (2d Cir.1963). There are four categories of marks that indicate increasing distinctiveness: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary or fanciful. *See Sports Auth.*, 89 F.3d at 961. Arbitrary or fanciful are sometimes described as separate categories. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992). Generic marks are not protectable. Descriptive terms are protectable only with evidence of secondary meaning. Suggestive, arbitrary, and fanciful marks are eligible for protection without proof of secondary meaning. *See Thompson Medical Co., Inc. v. Pfizer Inc.*, 753 F.2d 208, 212–13 (2d Cir.1985); *Russian Kurier*, 899 F.Supp. at 1208.

■ The sole basis for the defendants' argument that the name "Trockadero" and its variations are generic is that two other all male ballet groups have had the word "Trockadero" in their names. But there is no credible evidence that "Trockadero" is a generic term for an all male ballet group. The plaintiff correctly argues that the term "Trockadero" and its derivations have no independent relevance to the product at issue—all male satirical ballet—except to the extent that they have come to be associated exclusively with the plaintiff. Instead, the word "Trockadero" and its derivations are more properly categorized as arbitrary, *see Jordache Enters., Inc. v. Levi Strauss & Co.*, 841 F.Supp. 506, 515 (S.D.N.Y.1993) ("Arbitrary marks consist of words that neither suggest nor describe any characteristic of the particular good or service with which it is used."), and therefore are entitled to trademark protection, *see Sports Auth.*, 89 F.3d at 961 ("Generic marks are not entitled to protection under the Lanham Act, while arbitrary marks will almost always be seen as strong marks."); *Charles of the Ritz Group Ltd. v. Quality King Distrib., Inc.*, 832 F.2d 1317, 1321 (2d Cir.1987) (stating that "arbitrary marks ... are among the strongest and most highly protected class of trademarks").

Once a mark is found to be protected by the Lanham Act, the central question is whether "numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of the defendant's mark," *Gruner + Jahr USA Publishing v. Meredith Corp.*, 991 F.2d 1072, 1077 (2d Cir.1993); *see also Sports Auth.*, 89 F.3d at 960; *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 390–91 (2d Cir. 1995), "or that there may be confusion as to [the] plaintiff's sponsorship or endorsement of the junior mark." *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 502 (2d Cir.1996); *see also Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204–05 (2d Cir.1979). Proof of actual confusion is not necessary. *See Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1227 (2d Cir.1987); *Web Printing Controls Co., Inc. v.*

*Oxy–Dry Corp.,* 906 F.2d 1202 (7th Cir.1990). However, proof of actual confusion is probative of a likelihood of confusion. *See Tisch Hotels, Inc. v. Americana Inn, Inc.,* 350 F.2d 609, 611 (7th Cir.1965); *David Sherman Corp. v. Heublein, Inc.,* 340 F.2d 377, 380 (8th Cir.1965).

In *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), the Court of Appeals for the Second Circuit set forth eight factors that courts are to consider when determining whether a likelihood of confusion exists. *See also Sports Auth.,* 89 F.3d at 960–65; *Hormel Foods,* 73 F.3d at 502–05. In *Polaroid,* the court declared that:

> [T]he prior owner's chance of success is a function of many [v]ariables: the strength of his mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers. Even this extensive catalogue does not exhaust the possibilities— the court may have to take still other variables into account.

*Polaroid,* 287 F.2d at 495. The decision as to whether a mark infringes requires a "comprehensive analysis of all the relevant facts and circumstances." *Vitarroz Corp. v. Borden, Inc.,* 644 F.2d 960, 968 (2d Cir.1981). The Court of Appeals for the Second Circuit has instructed that:

> [T]he *Polaroid* factors are not, of course, "exclusive" and should not be applied "mechanically." No single factor is dispositive, and cases may certainly arise where a factor is irrelevant to the facts at hand. But it is incumbent upon the district judge to engage in a deliberate review of each factor, and, if a factor is inapplicable to a case, to explain why. The steady application of *Polaroid* is critical to the proper development of trademark law, for it is only when the *Polaroid* factors are applied consistently and clearly over time that the relevant distinctions between different factual configurations can emerge.

*Arrow Fastener,* 59 F.3d at 400 (citations omitted). When the likelihood of confusion is in doubt, the question will be resolved in favor of the senior user. *See Telechron, Inc. v. Telicon Corp.,* 198 F.2d 903, 909 (3rd Cir.1952); *E.I. DuPont de Nemours & Co. v. Yoshida Int'l, Inc.,* 393 F.Supp. 502, 510 (E.D.N.Y.1975); *Lambert Pharmacal Co. v. Bolton Chem. Corp.,* 219 F. 325, 326 (D.C.N.Y.1915) (Hand, J.).

■ Analysis of the *Polaroid* factors demonstrates a plain likelihood of confusion.

1. The "strength" of a mark is a measure of " 'its tendency to identify the goods [or services] sold under the mark as emanating from a particular, although possibly anonymous, source.' " *Sports Auth.,* 89 F.3d at 960–61 (quoting *McGregor–Doniger, Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1131 (2d Cir. 1979)) (alteration in original). As explained above, the plaintiff's marks are arbitrary and therefore "are among the strongest and most highly protected class of trademarks." *Charles of the Ritz,* 832 F.2d at 1321. The strength of the plaintiff's mark is further supported by the fact that the plaintiff has continuously used the mark "Les Ballets Trockadero de Monte Carlo" for over twenty years.

2. In considering the degree of similarity between the marks, a court should address "two key questions: (1) whether the similarity between the two marks is likely to cause confusion and (2) what effect the similarity has upon prospective purchasers. In deciding whether the marks are similar as used, [a court does] not look just at the typewritten and aural similarity of the marks, but how they are presented in the marketplace." *Sports Auth.,* 89 F.3d at 962 (citation omitted).

There is some degree of similarity between the English-language version of the defendants' name "Les Ballet Torokka de Russia" and the plaintiff's marks "Les Ballets Trockadero de Monte Carlo," "Trockadero," and "Trocks." The plaintiff has presented evidence that some of the friends and relatives of the defendant dancers have commented on the similarity of the names and asked whether there is a connection between them.

(Konno Decl. ¶¶ 2–3; Toorvald Dep. (Skolnik Decl.Ex. I) at 15; Joe Dep. (Skolnik Decl.Ex. K) at 10–13.) Moreover, the similarities between the Trocks and the Torokka extend beyond their names. The Torokka is being presented in the marketplace as similar to the Trocks. The Torokka contains seven former members of the Trocks who previously toured in Japan. (Trevino Dep. (Skolnik Decl.Ex. A) at 18; Wolverton Dep. (Skolnik Decl.Ex. C) at 12–14; Aney Dep. (Skolnik Decl.Ex. D) at 3–4, 9; Angulo Dep. (Skolnik Decl.Ex. E) at 3, 13; Buskirk Dep. (Skolnik Decl.Ex. F) at 5–6; Millan Dep. (Skolnik Decl.Ex. H) at 3–4, 7; Curcio Dep. (Skolnick Decl.Ex. L) at 6–7.) All the ballets that the Torokka plan to perform in Japan have been part of the Trocks repertoire at some point in time. (Skolnick Decl.Ex. P at L47–48; Trevino Dep. (Skolnick Decl.Ex. A) at 55–56.) The Torokka will also use some of the same choreography. (Trevino Dep. (Skolnik Decl. Ex. A) at 23.)

The defendants also promoted the Torokka to the Japanese public in such a way as to capitalize on the similarity. The Torokka promotional materials distributed at actual Trocks performances and elsewhere specifically stated that the Torokka is a winter version of the Trocks. (Konno Decl. ¶ 3; Skolnik Decl.Ex. Q at DJ3, DJ98.) Chizuko Matsuyama of the Tokyo promotion company IN–OUT Japan even wrote to warn the assistant director of the Trocks about the confusion in Japan. (Skolnik Decl.Ex. R at P80.) Furthermore, ZAK Corporation's most recent trademark applications from April, 1996, are for the mark "Torokkadero Sia Ballet Dan" as opposed to the Japanese version of the "Torokka de Russia" mark. (Matsuo Decl. ¶ 14; Mizenko Decl. ¶¶ 3–4.)

3. In considering the proximity of the products, a court should "consider whether the two products compete with each other." *W.W.W. Pharmaceutical Co., Inc. v. Gillette Co.,* 984 F.2d 567, 573 (2d Cir.1993). The focus of the product proximity inquiry is "the likelihood that customers may be confused as to the [s]ource of the products, rather than as to the products themselves...." *McGregor–Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1134 (2d Cir.1979); *see also Arrow*

*Fastener,* 59 F.3d at 396. In this case, not only are identical services involved—performances by ballet troupes—but both services are within the same narrow subclassification of services—performances by all male satirical ballet troupes. Thus, consumers are likely to be confused as to the source of the ballet performances. *See Arrow Fastener,* 59 F.3d at 396; *Russian Kurier,* 899 F.Supp. at 1210.

4. "Bridging the gap refers to the 'senior user's interest in preserving avenues of expansion and entering into related fields.'" *Hormel Foods,* 73 F.3d at 504 (quoting *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.,* 753 F.2d 14, 18 (2d Cir.1985)). However, due to the proximity of the products, there is no gap for the defendants to bridge. They are already attempting to provide the same service in the same market.

5. "For purposes of the Lanham Act, actual confusion means 'consumer confusion that enables a seller to pass off his goods as the goods of another.'" *Sports Auth.,* 89 F.3d at 963 (quoting *W.W.W. Pharmaceutical,* 984 F.2d at 574 (quotation and citation omitted)). No actual consumer confusion need be shown to justify a finding of a likelihood of confusion, although the presence of actual confusion obviously supports such a finding. *See Russian Kurier,* 899 F.Supp. at 1210. To show actual confusion, the plaintiff must demonstrate that the defendants' use "could inflict commercial injury in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation." *Lang v. Retirement Living Publishing Co., Inc.,* 949 F.2d 576, 583 (2d Cir.1991). The plaintiff alleges that its potential injuries as a result of the defendants' infringement include trademark dilution, damage to reputation, and damage to prospective business and licensing negotiations in a market responsible for eighty percent of its income.

The plaintiff has presented evidence of actual confusion in both the United States and Japan. Some consumers have been confused as to the origin of the defendants' ballet troupe, mistaking it for the plaintiff's troupe. (Konno Decl. ¶¶ 2–3; Draper Decl. ¶¶ 1–4, 7.) Defendant Brian Joe admitted at his deposition that members of his dance group, family,

and friends asked him whether there is a connection or association between the Trocks and the Torokka. (Joe Dep. (Skolnik Decl. Ex. K) at 12–13.). One of the Trocks' own dancers became confused by the Torokka promotional materials and asked whether he was going to be fired because he had not been asked to perform in the "Trockadero Winter Tour" advertised by the defendants. (Molina Decl. ¶¶ 1–2; Draper Decl. ¶ 8.)

6. The plaintiff claims that the defendants acted in bad faith in adopting their mark. Bad faith is shown by demonstrating that the "defendant adopted its mark with the intention of capitalizing on [the] plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Arrow Fastener,* 59 F.3d at 397 (quoting *Lang,* 949 F.2d at 583 (quotation omitted)). As Judge Learned Hand explained:

> "Why it should have chosen a mark that had long been employed by [the plaintiff] and had become known to the trade instead of adopting some other means to identify its goods is hard to see unless there was a deliberate purpose to obtain some advantage from the trade which [the plaintiff] had built up." Indeed, it is generally true that, as soon as we see that a second comer in market has, for no reason that he can assign, plagiarized the "make-up" of an earlier comer, we need no more; for he at any rate thinks that any differentia he adds will not, or at least may not, prevent the diversion and we are content to accept his forecast that he is "likely" to succeed. Then we feel bound to compel him to exercise his ingenuity in quarters further afield.

*American Chicle Co. v. Topps Chewing Gum, Inc.,* 208 F.2d 560, 561–62 (2d Cir.1953) (quoting *Miles Shoes, Inc., v. R.H. Macy & Co.,* 199 F.2d 602, 603 (2d Cir.1952), *cert. denied,* 345 U.S. 909, 73 S.Ct. 650, 97 L.Ed. 1345 (1953)).

The defendants chose the name Torokka with full knowledge of the plaintiff's pre-existing marks. In fact, in a letter written to Les Ballets Trockadero de Monte Carlo in 1994, a representative of ZAK Corporation revealed its awareness of the importance of the Trockadero mark:

> For, most promoters know that your company is very popular here in Japan and that you have a set [audience], fans, that come to your shows. For this it is so very easy for someone to sell Marcus's [company's] tickets well by saying, for instance, 'With the former members of the Ballet Trockadero' 'With the favorite ballets of the Trockadero' etc. So once again we would like for you to consider the registration of your name 'Les Ballets Trockadero de Monte Carlo', that we mentioned prior to the last tour.

(Skolnick Decl.Ex. R at P954.)

There is ample evidence that the defendants acted in bad faith. In 1994, Zak secretly and without authorization applied to register the plaintiff's mark in Japan, and, in 1996, he filed an application to obtain registration for "Torokkadero Shia Baree Dan" or Torokkadero Theater Ballet Company. From August 1995 to August 1996, Zak consistently sought to keep his plans for a new all male satirical ballet troupe secret from the Trocks. (Skolnik Decl.Ex. P at L1; Saito Dep. (Skolnik Decl.Ex. B) at 113–15; Skolnik Decl.Ex Q at DJ93, DJ63, DJ57, DJ56, DJ55, DJ48.) During July and August 1996, the defendants promoted their upcoming tour as "Trockadero Winter Version" and "Trockadero's Winter Company" by placing inserts in the Trocks' programs and by handing out flyers at Trocks' performances. (Skolnik Decl.Ex. Q at DJ2–3, DJ98; Miyazaki Decl. ¶ 26.) Furthermore, Zak insists that he "will continue to distribute flyers and whatever else to promote an upcoming event because there's nothing illegal or immoral about advertising its own upcoming event at a venue chosen and paid for by Zak." (Miyazaki Decl. ¶ 26.) Zak even admits that the word "Torokadero" or Trockadero is crucial to marketing an all male satirical ballet tour in Japan. (Miyazaki Decl. ¶ 25.) The evidence is compelling that the defendants are using a confusingly similar name to that of the plaintiff's in bad faith in order to capitalize on the plaintiff's name and reputation.

7. The analysis of the quality of the defendants' product "is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact

that the junior user's product is of inferior quality." *Arrow Fastener*, 59 F.3d at 398. The plaintiff alleges, without contradiction, that the defendants' ballet troupe will not have the same quality as the plaintiff's because many of the defendants' dancers have not performed the dances and because they will only have had a brief rehearsal period. Furthermore, when the quality of a junior user's product is similar to that of the senior user, there may be a likelihood of confusion of the source of the products. *See. Hormel Foods*, 73 F.3d at 505.

8. In considering the sophistication of consumers, a court must evaluate "[t]he general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods...." *McGregor–Doniger*, 599 F.2d at 1137 (quoting 3 R. Callman, *The Law of Unfair Competition, Trademarks and Monopolies* § 81.2, at 577 (3d ed.1969)); *see also Sports Auth.*, 89 F.3d at 965; *W.W.W. Pharmaceutical*, 984 F.2d at 575. The plaintiff persuasively argues that although consumers of all male satirical ballet are likely to be somewhat more sophisticated about that service than the average consumer, the relevant consumers in this case are likely to purchase the defendants' service without careful advance scrutiny for several reasons. The Torokka is partly comprised of former Trocks dancers, the Trocks' fans are being targeted for sales of the infringing service, there is a strong similarity between the plaintiff's and the defendants' marks, and the defendants have actually used the plaintiff's marks in advertising and promotional materials. Moreover, even consumers who distinguish between the Trocks and the Torokka are not likely to realize that the origin of the two troupes is different. *See Russian Kurier*, 899 F.Supp. at 1210–11.

In this case, each of the *Polaroid* factors points toward a likelihood of confusion and supports a preliminary injunction.

## C.

█ In a trademark infringement case, a showing of likelihood of confusion is usually sufficient to establish irreparable injury. *See* *Russian Kurier*, 899 F.Supp. at 1212. Such a showing demonstrates that the plaintiff's reputation is in the hands of the defendants pending trial and that the plaintiff's damages will be difficult to measure. In *Omega Importing Corp. v. Petri–Kine Camera Co.*, 451 F.2d 1190 (2d Cir.1971), the Court of Appeals for the Second Circuit concluded:

> Where there is, then, such high probability of confusion, injury irreparable in the sense that it may not be fully compensable in damages almost inevitably follows. While an injured plaintiff would be entitled to recover the profits on the infringing items, this is often difficult to determine; moreover, a defendant may have failed to earn profits because of the poor quality of its product or its own inefficiency. Indeed, confusion may cause purchasers to refrain from buying either product and to turn to those of other competitors. Yet to prove the loss of sales due to infringement is also notoriously difficult. Furthermore, if an infringer's product is of poor quality, or simply not worth the price, a more lasting but not readily measurable injury may be inflicted on the plaintiff's reputation in the market.

*Id.* at 1195 (citation omitted) (reversing order denying preliminary injunction); *see also Tough Traveler*, 60 F.3d at 967 ("In a trademark case, irreparable injury may be found where there is any likelihood that an appreciable number of ordinary prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.") (citations and internal quotation marks omitted); *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir.1988) (finding that showing of likelihood of confusion "establishes both a likelihood of success on the merits and irreparable harm"); *Home Box Office, Inc. v. Showtime/The Movie Channel Inc.*, 832 F.2d 1311, 1314 (2d Cir. 1987) (finding that showing of likelihood of confusion establishes both requisite likelihood of success on the merits as well as risk of irreparable harm); *General Motors Corp. v. Gibson Chem. & Oil Corp.*, 786 F.2d 105, 109 (2d Cir.1986); *Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.*, 754 F.2d 91, 95 (2d Cir.1985) (finding that the plaintiff

proves irreparable injury if it shows that it will lose control over reputation of its trademark pending trial); *LeSportsac, Inc. v. K Mart Corp.,* 754 F.2d 71, 79 (2d Cir.1985) ("Likelihood of confusion is itself strong evidence that in the absence of an injunction [the moving party] might face irreparable harm."). The plaintiff in this case has not only shown a strong likelihood of confusion, but has persuasively argued that the potential harms if no injunction is issued include dilution and damage to the plaintiff's U.S. registered marks and reputation, as well as damage to the Trocks' prospective business and licensing negotiations in a market from which it derives eighty percent of its income.

■ The defendants argue that the plaintiff is not entitled to a preliminary injunction because of its two to three month delay in moving for such extraordinary relief. The defendants are correct that the presumption of irreparable harm attaching to a showing of a likelihood of confusion is negated if the plaintiff has not been diligent in seeking relief. *See Tough Traveler,* 60 F.3d at 968 ("[A]ny such presumption of irreparable harm is inoperative if the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief."); *Comic Strip, Inc. v. Fox Television Stations, Inc.,* 710 F.Supp. 976, 981 (S.D.N.Y.1989) ("The plaintiffs' dilatory prosecution of its rights somewhat vitiates the notion of irreparable harm."). However, in this case, the plaintiff has been diligent both in demanding that the defendants cease and desist from using the mark and in bringing the present lawsuit when the defendants refused to stop. The plaintiff only obtained actual evidence of the defendants' proposed tour in July, 1996, when they were on tour in Japan, (Draper Decl. ¶¶ 2–4; McDougle Decl. ¶ 5), and protested to Zak's representatives soon thereafter, (Draper Decl. ¶ 5). The plaintiff refrained from taking immediate legal action against the defendants because its dancers were dependent on ZAK Corporation for both accommodations within Japan and for transportation back to the United States. (McDougle Decl. ¶ 5.) Once the Trocks completed its tour and the dancers had returned to the United States in early August, 1996, the plaintiff instructed its attorneys to take

appropriate action. (McDougle Decl. ¶ 6.) On August 19, 1996, the plaintiff's counsel sent the defendants a cease and desist letter, (Am.V.Compl. Ex. I; McDougle Decl. ¶ 6), and on August 30, 1996, the plaintiff commenced this action. That is sufficient diligence.

**D.**

■ If the plaintiff had shown only the existence of sufficiently serious questions going to the merits, but not a likelihood of success, then it would be necessary for it to show a balance of hardships tipping decidedly in its favor in order to obtain preliminary injunctive relief. *See Russian Kurier,* 899 F.Supp. at 1212. The plaintiff has in fact shown that the balance tips decidedly in its favor. The plaintiff has shown that there is a strong likelihood that the public will be confused as to the origin of the defendants' ballet troupe and that it is likely to suffer irreparable harm, which includes dilution and damage to the plaintiff's U.S. registered marks and reputation, as well as damage to the Trocks' prospective business and licensing negotiations in a market from which it derives eighty percent of its income. On the other side of the balance, the defendants will be prevented from using a particular name for their ballet troupe. Yet, it is a name they adopted long after the plaintiff started to use it. And, the defendants adopted it in an apparent effort to gain advantage in the marketplace in Japan, competing directly against the plaintiff who had a right to use that name. The defendants will not be prevented from performing in Japan under a different name, and, in any event, IPM expects to pay the defendant dancers under their contracts even if the Japanese winter tour does not take place. (Saito Dep. (Skolnik Decl.Ex. B) at 65–66.)

The Court will not enter an injunction that prevents the defendant dancers from performing in a male satirical ballet troupe that competes with the plaintiff. Nor will the Court enjoin the defendants from contracting with Zak or ZAK Corporation. The plaintiff is entitled to protection against infringement of its marks. It is not entitled to the elimination of competition. The injunction will be

directed to assuring that the plaintiff is protected only against infringement on its marks, including preventing the defendants from exploiting the infringements that have occurred—such as by proceeding with the performances that have been booked through the use of the infringing marks.

Given the reasons for the injunction, the harms that would occur without the injunction, and the carefully limited scope of the injunction, it is plain that the balance of hardships from issuing the injunction tips decidedly against the defendants.

## IV.

For the foregoing reasons, the defendants, their officers, agents, servants, employees, and attorneys, acting as such, and those persons acting in concert or participation with them who receive actual notice of this order, are enjoined during the pendency of this action from directly or indirectly using the name "Les Ballets Torokka de Russia," or the words "Trocks," "Trock," "Trockettes," "Trockadero," "Torokka," "Torokkadero," or "Trocadero" (or similar variations of any such word) in conjunction with the words "Ballet," "Ballets," or any other words identifying a dance company or dance troupe, or using any other mark, words, or names confusingly similar to Les Ballet Trockadero de Monte Carlo, Inc., including the use thereof in any advertising or promotional material, whether printed, verbal, broadcast, electronically or otherwise. The defendants, together with their officers, agents, servants, employees, and attorneys, acting as such, and those persons acting in concert or participation with them who receive actual notice of this order, are also enjoined from participating in the specific performances scheduled and promoted under the infringing "Torokka" name and from dancing at the performances at those theaters on those specific dates. *See, e.g., Tripledge Prods., Inc. v. Whitney Resources, Ltd.,* 735 F.Supp. 1154, 1166–67 (E.D.N.Y.1990); *Ebeling & Reuss Co. v. International Collectors Guild, Ltd.,* 462 F.Supp. 716, 721–22 (E.D.Pa.1978); *Five Platters, Inc. v. Purdie,* 419 F.Supp. 372, 384, 388 (D.Md.1976); *Matsushita Elec. Corp. v.*

*Solar Sound Sys.,* 381 F.Supp. 64, 70 (S.D.N.Y.1974).

This injunction shall take effect on October 31, 1996, provided that the plaintiff has posted a bond in the amount of $100,000, pursuant to Fed.R Civ.P. 65(c), no later than 5:00 p.m. on October 31, 1996.

**SO ORDERED.**